STATE OF CONNECTICUT *v.* IVAN J. BLADES
(14383)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

610

Argued January 8—decision released June 1, 1993

*Susan M. Hankins,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*C. Robert Satti, Sr.,* state's attorney, with whom were *Kevin T. Kane,* assistant state's attorney, and, on the brief, *Shelley L. Graves,* legal intern, for the appellee (state).

NORCOTT, J. The defendant appeals from a judgment of conviction of murder in violation of General Statutes § 53a-54a[1] following a trial to a three judge panel. The defendant was sentenced to a term of incarceration of forty-five years. On appeal, he claims that the

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts *under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be,* provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

trial court improperly: (1) denied his motion to suppress evidence derived from a warrantless entry into his home, which the police had allegedly entered pursuant to the "emergency" exception to the warrant requirement; (2) concluded that the defendant had failed to prove the affirmative defense of extreme emotional disturbance by a preponderance of the evidence; and (3) admitted irrelevant and prejudicial evidence that the victim had feared the defendant. We affirm the judgment of conviction.[2]

The trial court could reasonably have found the following facts. The defendant, Ivan Blades, and the victim, Dorothy Blades, had a marriage beset by troubles. At the time of the victim's death, the couple had two children, Carol, age thirteen, and LaMont, age nine. On May 1, 1987, Carol was severely burned in a fire at the home of a friend and suffered permanent injuries. She subsequently spent three months in a hospital burn center in Boston, Massachusetts. The defendant blamed Carol's misfortune on the victim, because she had given Carol permission to visit the friend's home where the fire took place.

The defendant had been a drug user even before Carol was burned in the fire. After the fire, however, his drug use increased and he became an abuser of "crack" cocaine. As a result of his depression over Carol's injury and his drug use, his work performance suffered and caused him often to be tardy and absent from work. The defendant also borrowed large sums of money from coworkers on paydays. Between June and August, 1988, the defendant was periodically suspended from work, and he was finally discharged on September 16, 1988.

[2] The state argues, as an alternative ground to sustain the judgment of conviction; see Practice Book § 4013 (b); that the trial court improperly denied its motion in limine to restrict the testimony of the defendant's expert on the defense of extreme emotional disturbance. Because we affirm the trial court's judgment, we do not reach the state's claim.

Following Carol's accident, the defendant's home life also deteriorated. There were frequent domestic arguments between the defendant and the victim regarding Carol's injury, the defendant's drug use, his frequent absence from the home, and their failure to pay the rent and other bills. Within a short period of time before and after the accident, the defendant's grandparents, brother and uncle died. In September, 1988, after he had been discharged from his employment, the defendant abandoned the family home and went to New York, where he stayed until his unexpected return home in late October, 1988.

When the defendant returned home, the domestic tensions continued. The victim did not want the defendant back in the house. Carol testified that the victim in fact had told her that she was afraid of the defendant and that she wanted a divorce and a restraining order barring him from the house. Before the defendant had gone to New York, he had been violent toward the victim and had threatened to harm her if she ever left him. After his return, the defendant again threatened to harm the victim and told the victim's mother, Hattie Sanders, that if he was "going down," he was taking his family down with him.

The defendant's family had been evicted from its apartment for nonpayment of rent and was scheduled to move on November 30, 1988. That morning, the defendant and the victim consulted an attorney regarding their eviction and a lawsuit that they had brought related to the fire in which Carol had been injured. When they returned home, they had an argument. The defendant followed the victim into the bathroom, where he stabbed the victim repeatedly and left her body in the bathtub.

That afternoon, when the children returned home from school, the defendant met them outside the apart-

ment and explained that he was taking them to a friend's house. He told them that their Uncle Donnie had been shot and that their mother had gone to New York. Later that evening, the defendant picked up the children and put them on a train to New York, where he had arranged for his sister, Diana Blades Coleman, to meet them.

When Coleman met the children at the railroad station, Carol informed her that she had been told that her uncle had been shot and, for that reason, her mother had come to New York earlier that day. Coleman said she knew nothing about it. Carol then called Sanders, her grandmother, and learned that her uncle was fine and that the victim had not arrived in New York. Carol also called friends of the victim and the victim's workplace in an attempt to locate her.

Both Sanders and Coleman repeatedly called the New London police department to relay their concern over the disappearance of the victim and to request a police investigation. After some investigation, Detective David Gigliotti determined that entry into the defendant's home was necessary to protect or preserve the victim's life and, without obtaining a search warrant, he gained entry into the apartment with a pass key obtained from the apartment manager. In the bathtub of the defendant's apartment, Gigliotti discovered the fully clothed body of the victim under a blood soaked blanket. The body had multiple stab wounds including defensive wounds on the hands and forearms.

The next morning, December 1, 1988, the defendant drove his car into the New London police parking lot and was arrested. He had bruises on his shoulders and arms and had multiple cuts on the fingers of his right hand and a bite mark near the thumb. The defendant appeared to be unemotional.

Without contesting that he had killed the victim, at trial the defendant asserted the affirmative defense of extreme emotional disturbance pursuant to General Statutes § 53a-54 (a). The defendant also moved to suppress all physical evidence that had been seized from his home, including all items seized pursuant to search warrants because, he claimed, all the seized evidence allegedly had been derived from an invalid warrantless entry. The trial court denied this motion concluding that the warrantless entry into the defendant's home had been justified under the emergency exception to the warrant requirement. The trial court also concluded that the defendant had failed to prove the defense of extreme emotional disturbance by a preponderance of the evidence and found him guilty of murder. The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3).

I

The defendant first claims that the trial court improperly denied his motion to suppress the evidence that had been derived from a warrantless search of the defendant's apartment, in violation of the fourth amendment to the United States constitution[3] and article first, § 7, of the Connecticut constitution.[4] We disagree.

[3] The fourth amendment to the United States constitution provides: "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches or seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the places to be searched, and the persons or things to be seized."

The fourth amendment to the United States constitution was made applicable to the states through the fourteenth amendment's due process clause. *Mapp* v. *Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[4] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The defendant also cites to article first, § 8, of the Connecticut constitution to support his claim, but fails to provide an explanation or analysis

The trial court found the following facts regarding the defendant's motion to suppress. At 11:06 p.m. on November 30, 1988, Gigliotti received a telephone call from the victim's mother, Sanders. Concerned about the disappearance of her daughter, she informed Gigliotti about the defendant's and the victim's marital problems, the false story about the children's uncle having been shot, and the arrival of the couple's unattended children in New York. She then told the police officer that "I think something has been done to her." As a result of this conversation, at 11:17 p.m. Gigliotti dispatched Officer Dean Forier to the defendant's residence.

Approximately seven minutes later, Gigliotti received a call from Coleman, who reiterated the information given by Sanders. Forier arrived at the defendant's house and at 11:29 p.m. called Gigliotti to report his findings. Forier reported that he had gone to the defendant's door and that the defendant had asked: "Who is it?" When Forier identified himself as a police officer, the defendant responded, with no question from Forier: "My wife is in New York." Forier told the defendant that he was responding to a call from Sanders and recommended that he telephone his concerned relatives.

At approximately 12:29 a.m., Gigliotti called the victim's employer and learned that the victim's daughter had previously called looking for the victim. Gigliotti received calls between 11:58 p.m. and 12:41 a.m. from Sanders and Coleman repeatedly expressing concern about the victim's absence. At 12:41 a.m., Coleman asked the police to enter the Blades' apartment. Ten minutes later, Gigliotti and other officers involved in

of the relevance of this provision to a warrantless entry into the defendant's residence. We therefore analyze the defendant's state constitutional claim under article first, § 7, alone.

the case decided that there was reason to believe that someone was injured or in danger in the apartment and that it would be necessary to enter to protect or preserve life. Gigliotti then left for the defendant's apartment.

At 12:59 a.m., Gigliotti learned from Sergeant John Weinberg that a family friend had gone to the apartment and that the defendant had told her that everything was fine. Several moments later, however, when Weinberg went to the apartment, he heard music inside but received no response to his knock at the door. When he arrived at the apartment building, Gigliotti and three other officers entered the rear doorway of the building. Gigliotti noticed a blood smear on the interior side of the door, and then went upstairs to the defendant's apartment. Gigliotti received no response when he knocked and rang the doorbell at 1:09 a.m.

Gigliotti entered the apartment with a pass key that he had obtained from the apartment manager. He saw blood smears on the wall in the rear hallway and a large amount of blood in the bathroom. He then discovered the victim's body in the bathtub. The defendant was not present. Gigliotti secured the premises and left. On the basis of this information, search warrants were obtained and the police uncovered other physical evidence of the crime.

Prior to trial, the defendant filed a motion to suppress that covered all evidence derived from the warrantless entry including, but not limited to, the fact of the victim's death, any physical evidence located within the apartment, and items seized pursuant to several search warrants. The trial court, *Hendel, J.,* denied the motion on the ground that the initial entry into the defendant's apartment was justified under the emergency exception to the warrant requirement of the federal and state constitutions. The trial court concluded

that "the facts and circumstances known to Detective Gigliotti support[ed] an objectively reasonable belief that entry into the defendant's apartment was necessary to protect or preserve life."

The defendant claims that the trial court improperly concluded that the warrantless entry of his apartment was justified under the emergency exception to the warrant requirement. The defendant argues that the facts underlying the police officers' decision to enter the defendant's apartment were insufficient to create an objectively reasonable belief that entry was necessary to protect or preserve life. The defendant also argues that, even if the search was valid under the federal constitution, it was not permissible under article first, § 7, of the Connecticut constitution, which may afford broader protection than its federal counterpart. We disagree with both contentions.

"[I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo." *State* v. *Geisler,* 222 Conn. 672, 694, 610 A.2d 1225 (1992). Conclusions drawn from the underlying facts must be legal and logical. Id., 693. We must determine, therefore, whether, on the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed.

"[A] search conducted without a warrant issued upon probable cause is *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Magnano,* 204 Conn. 259, 265, 528 A.2d 760 (1987). Searches conducted pursuant to emergency circum-

stances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions. See *State* v. *Geisler,* supra, 691; *State* v. *Magnano,* supra, 265–66; *State* v. *Klauss,* 19 Conn. App. 296, 299–301, 562 A.2d 558 (1989). "[T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited, involving a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search." (Citations omitted; internal quotation marks omitted.) *State* v. *Geisler,* supra, 691.

The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception. *Mincey* v. *Arizona,* 437 U.S. 385, 390–91, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home. *State* v. *Geisler,* supra, 692; *State* v. *Guertin,* 190 Conn. 440, 453, 461 A.2d 963 (1983). "[The police] must 'have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . .' *People* v. *Mitchell,* 39 N.Y.2d 173, 178, 347 N.E.2d 607, 383 N.Y.S.2d 246, cert. denied, 426 U.S. 953, 96 S. Ct. 3178, 49 L. Ed. 2d 1191 (1976). . . . The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an

emergency existed. . . ." (Citations omitted.) *State* v. *Geisler*, supra, 692; see also *United States* v. *Zabare*, 871 F.2d 282, 291 (2d Cir.), cert. denied, 493 U.S. 856, 110 S. Ct. 161, 107 L. Ed. 2d 119 (1989). "The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known *at the time of entry.*" (Emphasis in original.) *State* v. *Geisler*, 22 Conn. App. 142, 150, 576 A.2d 1283, cert. denied, 215 Conn. 819, 576 A.2d 547 (1990), vacated, 498 U.S. 1019, 111 S. Ct. 663, 112 L. Ed. 2d 657, on remand, 25 Conn. App. 282, 594 A.2d 985 (1991), aff'd, 222 Conn. 672, 610 A.2d 1225 (1992).

As a prefatory matter, we note that the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. "[I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation." E. Mascolo, "The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment," 22 Buff. L. Rev. 419, 428 (1973). "Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . ." *People* v. *Mitchell,* supra, 180.

Police often operate in the gray area between their community caretaking function and their function as criminal investigators. Often there is no bright line separating the one from the other; the emergency doctrine relies on an objective test wherein the reasonableness of the officer's belief is assessed on a case-by-case basis. Among the infinitely varied situations in which

entry for the purpose of rendering aid is reasonable, one is the search for an occupant reliably reported missing. 2 W. LaFave, Search and Seizure (2d Ed. 1987) § 6.6 (a), p. 702; see *People* v. *Clayton,* 34 Ill. App. 3d 376, 339 N.E.2d 783 (1975) (police entered woman's apartment when no one answered door after woman was reported missing and husband was known to carry a gun and to have threatened to kill her); *State* v. *Epperson,* 571 S.W.2d 260 (Mo. 1978), cert. denied, 442 U.S. 909, 99 S. Ct. 2820, 61 L. Ed. 2d 274 (1979) (warrantless entry pursuant to emergency doctrine justified based on report of defendant's wife and children as missing for several days and defendant's false and inconsistent explanations for their absence); *People* v. *Mitchell,* supra (search of hotel room justified when chambermaid who had reported to work could not be found and street clothes were found).

Here, in what the defendant describes as nothing more than a "missing person investigation," the police had the following facts available to them to justify their belief that an emergency situation existed. For over two hours Gigliotti had received phone calls from the victim's worried relatives about her whereabouts and welfare, even after the defendant had been informed by Forier that his relatives were concerned and that he should call them. Gigliotti learned that the victim had been involved in a troubled marriage and that Sanders, her mother, believed that the defendant had harmed her. The victim's relatives had also reported that the defendant had sent his two children unattended by train to New York and had given a patently false reason for doing so. When first approached by the police, the defendant had volunteered that his wife had left for New York earlier in the day, before any mention of his wife had yet occurred. Although a family friend had stated that she had spoken to the defendant, no response was made to police attempts to con-

tact the defendant shortly thereafter. Further investigation revealed that the victim's whereabouts could not be confirmed by family, friends or the victim's employer. Gigliotti's belief that the victim might be in need of immediate aid was further heightened when he observed a blood-like smear on the interior door to the common hallway of the defendant's building.[5]

We conclude, on the basis of this record, that it was reasonable for the police to believe that the victim was in immediate need of aid. In the cool morning of appellate review we will not ignore the heated passion of immediacy that was the essence of the anxious concerns about the victim's safety and well-being during those nighttime hours. In view of the empirical facts upon which the police acted at the time of the entry, that entry, while too late to save the life of the victim, was warranted and justifiable. We conclude that the trial court properly denied the defendant's motion to suppress the evidence found pursuant to the police officers' legitimate emergency entry.[6]

---

[5] We are not persuaded by the defendant's suggestion that, because Gigliotti had decided that an emergency situation warranting entry into the defendant's home existed before noticing the blood smear in the hallway, the smear was not part of the facts underlying Gigliotti's decision to enter the apartment. The relevant inquiry under the emergency doctrine focuses on what facts and circumstances were known to the police at the time of entry. The question of when the decision to enter was made is irrelevant to this inquiry. State v. Geisler, 22 Conn. App. 142, 150, 576 A.2d 1283, cert. denied, 215 Conn. 819, 576 A.2d 547 (1990), vacated, 498 U.S. 1019, 111 S. Ct. 663, 112 L. Ed. 2d 657, on remand, 25 Conn. App. 282, 594 A.2d 485 (1991), aff'd, 222 Conn. 672, 610 A.2d 1295 (1992); 2 W. LaFave, Search and Seizure (2d Ed. 1987) § 6.6 (a), p. 698.

[6] Because of our conclusion on this issue, we need not address the state's contention that the police never actually conducted a search. It is well established that, after a lawful entry based on an emergency situation, the police are limited to searching and seizing items that are in plain view during the course of their legitimate emergency activities. Mincey v. Arizona, 437 U.S. 385, 393, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). Similarly, because of our disposition of this case, we need not address the state's argument with respect to the inevitable discovery doctrine.

The defendant also argues, under our state constitution, that we should adopt a standard of "no less than probable cause" to govern use of the emergency doctrine in this state. It is significant to remember that the emergency exception does not arise from a police function of criminal investigation, but from the community caretaking function. "[P]robable cause is the sine qua non of criminal searches . . . ." Note, "The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment," 43 Fordham L. Rev. 571, 577 (1975). "Probable cause, broadly defined, comprises such facts 'as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe' that criminal activity has occurred." *State* v. *Barton,* 219 Conn. 529, 548, 594 A.2d 917 (1991). We see no reason to require the standard for criminal investigatory searches to govern an emergency doctrine exception that derives, not from the investigatory function, but from the function designed to save human life.

The standard regulating warrantless searches pursuant to the emergency doctrine is reasonableness. A police officer's objectively reasonable belief that a person might be in need of immediate aid or assistance will justify a warrantless entry. See *State* v. *Geisler,* supra, 222 Conn. 692; *State* v. *Magnano,* supra, 266; *State* v. *Klauss,* supra, 302.[7] We are unpersuaded that

[7] The defendant seems to argue that the case of *People* v. *Mitchell,* 39 N.Y.2d 173, 347 N.E.2d 607, 383 N.Y.S.2d 246, cert. denied, 426 U.S. 953, 96 S. Ct. 3178, 49 L. Ed. 2d 1191 (1976), stands for the proposition that probable cause is the proper standard for warrantless entry under the emergency doctrine. The court in *Mitchell* summarized the elements of the emergency exception as follows: "(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, *approximating probable cause,* to associate the emergency with the area or place to be searched." (Emphasis added.) Id., 177–78. We read the third of these elements as merely suggesting a

there is any need to change this standard at this time and, therefore, we reject this argument of the defendant.

Similarly, we reject the defendant's argument that, even if the warrantless entry into the defendant's apartment was justified under the federal constitution, it was invalid under the more expansive protection of article first, § 7, of our state constitution because that provision contemplates a stricter standard of reasonableness.[8] See *State* v. *Enright*, 17 Conn. App. 142, 147 n.4, 550 A.2d 1095 (1988). "We have . . . determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." *State* v. *Marsala*, 216 Conn. 150, 160, 579 A.2d 58 (1990).

Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any

higher standard with respect to the association between the place to be entered and the person being sought. In other words, once having determined that an emergency situation exists, the police cannot, under the pretext of an emergency, enter just any place. They should have some basis akin to probable cause to believe that the place to be entered is relevant to their emergency search. We do not adopt the language of the New York court because we believe that our "reasonable belief" standard, without further refinement, suffices to govern the emergency doctrine in Connecticut.

[8] The defendant also argues that *State* v. *Geisler*, 25 Conn. App. 282, 594 A.2d 985 (1991), aff'd, 222 Conn. 672, 610 A.2d 1225 (1992), recognized a broader scope of the exclusionary rule under the state constitution than under the federal constitution. The defendant suggests, without analysis, that this broader scope should not have permitted the admission of the evidence seized in this case. Because we conclude that the entry into the defendant's apartment was legal under the state constitution, we need not consider whether the state constitution would afford a different remedy for an illegal entry.

place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." This language is similar, although not identical, to that of the fourth amendment to the United States constitution. Both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution proscribe only unreasonable searches and seizures. *State* v. *Dukes,* 209 Conn. 98, 121, 547 A.2d 10 (1988); *State* v. *Januszewski,* 182 Conn. 142, 148, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981).

In *State* v. *Geisler,* supra, 222 Conn. 691–92, we recognized an emergency exception to the state constitution that mirrored the exception afforded under the federal constitution. We do not agree with the defendant's argument that the reasonableness of the police officers' entry under the emergency doctrine should be assessed under a different standard under the state constitution from the standard prevailing under the federal constitution. Under both federal and state provisions, "there is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion which the search or seizure entails." *State* v. *Januszewski,* supra, 148. We conclude that the police entry into the defendant's apartment under the emergency exception to the warrant requirement was valid under both the federal and state constitutions. We conclude, therefore, that the trial court properly denied the defendant's motion to suppress evidence derived from the warrantless entry.

II

The defendant next claims that the trial court improperly concluded that he had failed to prove his affirmative defense of extreme emotional disturbance by a preponderance of the evidence. We disagree.

The defendant did not testify at trial but presented six witnesses to establish his extreme emotional disturbance defense. The defendant's sister, Coleman, testified about the effect traumatic incidents had had on the defendant, and that the defendant usually suppressed his emotions during personal crises. She testified that she had become aware of his drug use after his grandmother's death in early 1988. Stephen Johnson, the defendant's family physician, testified to an incident on October 29, 1987, when the defendant suffered a temporary blackout and paralysis as a result of a "conversion reaction to stress."

The defendant also produced the testimony of Robert Griswold, his supervisor at his previous place of employment, who testified that despite a very satisfactory beginning, the defendant's work performance began to deteriorate shortly after the injury to his daughter. Griswold testified that the defendant had become increasingly somber, despondent, very emotional and "depressed all the time," and recounted an incident in which the defendant had had an irrational reaction to his son's common cough. Dennis Murphy, the defendant's attorney on other occasions, testified that the defendant and the victim blamed each other for Carol's accident, and that they had consulted him about a divorce sometime in 1988. He further testified that, at a meeting in his office on the day of the murder, the defendant appeared "a beaten man," "[j]ust beaten down and resignation. Just abject resignation."

The crux of the defendant's case was presented by the testimony of the defendant's expert witness, Kenneth Selig, a board certified psychiatrist. Between March 28 and December 19, 1989, Selig interviewed the defendant on fourteen different occasions in connection with the charges brought against him. Selig testified that the defendant was a very controlled person who internalized most of his emotions. He testified that

the defendant had begun to feel overwhelmed by events in his life and had lost patience with his wife. Selig explained that, on the day of the murder, the defendant had followed the victim into the bathroom after she had picked up a knife in the kitchen because he believed that she was suicidal. When the defendant had attempted to take the knife away from her, the victim resisted and the defendant was cut on his hand. At that moment, Selig opined, "it all flooded in on him. All of the rage, everything he had been trying to dam up and deny and push away, just flashed in. And he lost it. He got out of control." On cross-examination,[9] Selig opined that the defendant was not psychotic, but that he suffered from an "adjustment disorder with mixed emotional features," and that the defendant's mental illness did not rise to the level of insanity. Selig also testified that the essential feature of an adjustment disorder is a maladaptive reaction to an identifiable psychosocial stress that occurs within three to six months after the onset of a stressor. He identified several of the defendant's major stressors as Carol's accident, work difficulties, and the pressures of his marital and financial problems.

Selig also testified, on cross-examination, that the source of his information concerning the murder was the defendant himself, and that his conclusion about the defendant losing control might have been different had he not relied on the defendant's statement to him, during the course of an interview, that the victim had cut him prior to his stabbing of her.[10] He acknowledged that a person suffering from the particular type of disorder that afflicted the defendant was no more

[9] The state's principal attack on the defendant's defense of extreme emotional disturbance was its cross-examination of Selig. The state produced no expert witnesses of its own.

[10] Selig testified that he inferred from the interviews with the defendant that the defendant had killed the victim.

likely to react violently to a stressor than a mentally healthy person. Selig further acknowledged that the defendant had no other mental illness, such as antisocial personality disorder or intermittent explosive disorder, that exhibits itself in violent behavior or loss of control.

The trial court concluded that the defendant had failed to prove the defense of extreme emotional disturbance because he had failed to show that he was exposed to extremely unusual or overwhelming stress greater than mere annoyance or unhappiness.[11] The defendant argues that the trial court's findings were entirely contrary to the evidence and that the court failed to consider the cumulative effect of the stresses under which the defendant was laboring. The essence of the defendant's argument appears to be that, because the state did not present its own evidence to rebut the defense, the trial court was required to accept the defendant's evidence and to find that the defendant had sustained his burden of proof. We disagree.

"[General Statutes §] 53a-54a (a) provides in relevant part that 'it shall be an affirmative defense [to the crime of murder] that the defendant committed the proscribed act or acts under the influence of extreme emotional

---

[11] The relevant portion of the trial court's decision on the defense of extreme emotional distress is as follows: "To determine whether the defendant has established the affirmative defense of extreme emotional disturbance by a preponderance of the evidence . . . three things must be established. . . . Two, that the defendant was exposed to extremely unusual and overwhelming stress that is not mere annoyance or unhappiness. . . . The evidence presented the panel shows the defendant to be a calm, collected, and intellectual individual, capable of masking his feelings to a great extent. The tragedy that [befell] his daughter was severe; but the evidence shows that he bore it well. Testimony concerning other problems were minor in scope. In the panel's opinion, the defense has failed to prove the—this prong of the test; and we find that the defendant's problems were more . . . mere annoyance . . . and/or unhappiness as opposed to extremely emotional and overwhelming stress."

disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.' Extreme emotional disturbance 'is a mitigating circumstance which will reduce the crime of murder to manslaughter.' *State* v. *Asherman,* 193 Conn. 695, 731, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)." *State* v. *Raguseo,* 225 Conn. 114, 122, 622 A.2d 519 (1993).

In reviewing the trial court's findings, we construe the evidence in the light most favorable to sustaining the verdict and will affirm the court's conclusion if it is reasonably supported by the evidence and the logical inferences drawn therefrom. *State* v. *Steiger,* 218 Conn. 349, 379, 590 A.2d 408 (1991); *State* v. *D'Antuono,* 186 Conn. 414, 421, 441 A.2d 846 (1982). The determination of the presence or absence of extreme emotional disturbance is one of fact for the trier, and our review is the same whether the trier of fact is a judge, a panel of judges or a jury. *State* v. *Steiger,* supra, 383.

The trier must find the following elements to find the existence of the statutory defense: " '(a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined in the code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions. Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for the individual no

longer prevailed at the time of the act.' " *State* v. *D'An-tuono,* supra, 420; *State* v. *Zdanis,* 182 Conn. 388, 390–91, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 607 (1981); *State* v. *Elliott,* 177 Conn. 1, 7–10, 411 A.2d 3 (1979).

"In a case in which the evidence is conflicting, it is the quintessential . . . function [of the fact finder] to reject or accept certain evidence, and to believe or disbelieve any expert testimony." *State* v. *Raguseo,* supra, 123. Despite the defendant's contention to the contrary, the trial court is not required to accept uncontradicted expert testimony. The court might reject it entirely as not worthy of belief or find that the opinion was based on subordinate facts that were not proven. *State* v. *Steiger,* supra, 379–81; C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 7.16.6, p. 178.

The court had before it evidence that the defendant suffered from a disorder that produced a maladaptive reaction to stress and that the defendant had experienced several stressful events in the preceding eighteen months. The defendant's expert also testified, however, that the defendant's disorder would not make the defendant more prone to be violent than is a mentally healthy person. Moreover, the court also heard evidence that the defendant was an extremely controlled person who internalized his emotions and engaged in drug use to escape from them. Additionally, there was ample testimony regarding the breakdown of the marital relationship, and the defendant's tendency to exhibit dominant and sometimes violent behavior. "[T]he trier of fact can disbelieve any or all of the evidence . . . and can construe that evidence in a manner different from the parties' assertions . . . ." *State* v. *Steiger,* supra, 381. On this record, we conclude that the trial court could reasonably have con-

cluded that the defendant had failed to prove, by a preponderance of the evidence, the existence of extreme emotional disturbance.

## III

The defendant's final claim[12] is that the trial court improperly admitted evidence of the victim's fear of the defendant because the evidence was irrelevant and hearsay.[13] The defendant challenges three evidentiary rulings of the trial court. First, in its case-in-chief, the state offered the testimony of Hattie Sanders, the victim's mother. Sanders testified that she had initially called the New London police on the night of her daughter's disappearance "[b]ecause my daughter, Dorothy, had told me if anything happened to her to call the police department and tell them to look for Ivan Blades, her husband." The state offered the statement for the purpose of showing the state of mind of the victim. The defendant objected on the grounds that the testimony was hearsay, irrelevant and remote.[14] Specifically, the state offered this statement of the victim's state of mind for three reasons: (1) to show the relationship between the victim and the defendant, presumably to demonstrate the defendant's motive and intent; (2) to establish whether the victim was likely to have attacked

[12] We granted the defendant's request for permission to file a supplemental brief to address the single issue of the trial court's admission of evidence of the victim's fear of the defendant, with specific attention to our recent decision in State v. Duntz, 223 Conn. 207, 613 A.2d 224 (1992).

[13] The defendant additionally claims that these evidentiary rulings violated his federal and state constitutional rights to a fair trial guaranteed him by the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. He fails, however, to provide any briefing or analysis in support of these federal and state constitutional claims. Accordingly, we consider these issues to be abandoned. State v. Gaines, 196 Conn. 395, 397 n.2, 493 A.2d 209 (1985); Sachem's Head Assn. v. Lufkin, 168 Conn. 365, 366, 362 A.2d 519 (1975).

[14] Sanders could not recall the precise date when her daughter had spoken these words.

the defendant; and (3) to show that the victim was in fact assaulted and killed. The trial court overruled the objection.

Second, as rebuttal to the defendant's extreme emotional disturbance defense, the state also offered the testimony of Kenneth Bissonette on the issue of the victim's fear of the defendant. Bissonette, who had investigated the victim's death, testified that, during a search of the defendant's apartment, he had found an ice pick in the victim's handbag. The defendant again unsuccessfully objected to this testimony.[15]

Third, Joanne Quilter, a friend and coworker of the victim, also testified, over the defendant's objection, that in February, 1988, the victim had told her that "[i]f anything ever happened to her, find the body, and let them know it was Ivan." The state offered this evidence "to dispute the testimony of Dr. Selig" regarding the extreme emotional disturbance defense.

The defendant argues that the trial court improperly admitted the testimony of Sanders, Bissonette and Quilter to show the victim's fear of the defendant. The defendant contends that, because the defendant concededly had killed the victim and did not assert the defense of self-defense, the victim's state of mind was not a material issue in this case and therefore the statements were irrelevant. The defendant also contends that, even if relevant, such testimony was inadmissible hearsay. Consequently, the defendant argues, any statement relating to the victim's state of mind should not have been admitted. The state argues that Sanders'

---

[15] The defendant objected, claiming that this testimony was not proper rebuttal testimony because it went to the defendant's intent, rather than his mental condition, and therefore belonged in the state's case-in-chief. The state offered this evidence to establish that it was unlikely that the victim would have attacked the defendant, which would dispute Selig's testimony on the extreme emotional disturbance defense.

testimony tended to show the breakdown of the marital relationship and was therefore relevant to show motive.[16] The state also argues that the testimony of Bissonette and Quilter was relevant to rebut the testimony of Selig, whose opinion of the defendant's emotional disturbance relied on the defendant's version of the events of November 30, 1988.[17]

A statement made out-of-court that is offered to establish the truth of the matter contained in the statement is hearsay, and as such is inadmissible. *State* v. *Packard,* 184 Conn. 258, 274, 439 A.2d 983 (1981). An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted. *State* v. *Rollinson,* 203 Conn. 641, 660, 526 A.2d 1283 (1987); *State* v. *Hoeplinger,* 27 Conn. App. 643, 649, 609 A.2d 1015, cert. denied, 223 Conn. 912, 612 A.2d 59 (1992); C. Tait & J. LaPlante, supra, § 11.3.2. Moreover, although nonverbal conduct may be hearsay if it is assertive in nature, conduct not intended as a communication is not hearsay. C. Tait & J. LaPlante, supra, § 11.2.

In this case, the trial court properly denied the defendant's hearsay objections because the testimony

---

[16] Although the defendant argues that there was no question as to the identity of the victim's killer at trial, the state contends that the defendant never directly admitted to anyone that he had killed his wife, and therefore evidence of motive aided in establishing the defendant as the assailant.

[17] The state argues in its brief that we should not reach the defendant's claim regarding the testimonies of Bissonette and Quilter because, with respect to Bissonette, the defendant's argument on appeal differs from his objection at trial, and, regarding Quilter, the defendant asserted no grounds for his objection to her testimony.

We will review these claims because we have determined that a fair reading of the transcripts reveals that: (1) the arguments on appeal and at trial concerning this claim are not substantially distinct; and (2) the court understood the defendant's objection to Quilter's testimony to be the same as that asserted against Bissonette.

in question was not hearsay. Two of the three challenged statements, those of Sanders and Quilter, were not offered for the truth of the matter asserted, but rather for the purpose of showing the victim's fear of the defendant. The third challenged statement, that of Bissonette, concerned a nonassertive act of the victim that tended to show her fear of the defendant. See *State* v. *McIntosh,* 199 Conn. 155, 162–63, 506 A.2d 104 (1986).

As to the second part of the defendant's argument that the statements were inadmissible because they were irrelevant, we agree with the state that the challenged testimony was admissible because it tended to show the victim's fear of the defendant and because that fear was relevant. We have held that a victim's fear of another individual is admissible when relevant to the issues at trial, although such cases have generally involved the testimony of a witness' personal observations of the victim's fear of the defendant. See *State* v. *Hull,* 210 Conn. 481, 501–502, 556 A.2d 154 (1989) (witnesses who overheard the victim wife talking to the defendant husband about another man were allowed to testify as to the victim's state of mind regarding her fear of the defendant and his motive for killing her); *State* v. *Thomas,* 205 Conn. 279, 285, 533 A.2d 553 (1987) (witnesses' testimony regarding observations made of the decedent's behavior and arguments with her defendant husband held admissible to show the deterioration of the marital relationship and the defendant's motive for the homicide); *State* v. *McIntosh,* supra, 162–63 (trial court properly admitted the testimony of the victim's mother that, on the night before her daughter was killed, the victim came to her apartment to phone the police because the defendant husband was at her daughter's front door; the testimony, which was admitted under the state of mind exception to the hearsay rule to show the victim's fear of the defendant, was relevant).

Recently, in *State* v. *Duntz,* 223 Conn. 207, 613 A.2d 224 (1992), we addressed the admissibility of a victim's out-of-court statements made to a witness regarding the victim's fear of the defendant. In *Duntz,* the state elicited testimony that the victim of a murder had made statements to several witnesses indicating that the victim feared that the defendant would harm him. The state offered this testimony for the purpose of showing that the victim and the defendant had an antagonistic relationship and therefore that the defendant had a motive and the intent to kill the victim. We held that these statements of the victim's fear of the defendant were irrelevant to the issue of the defendant's motive and intent because "the jury could not have drawn such an inference solely from the statements of the victim without resorting to impermissible speculation." Id., 233.

Our decision in *Duntz,* however, does not stand for the proposition that all statements of a victim's fear of a defendant are irrelevant, regardless of the reason for which they are offered. Such statements were held to be inadmissible only because they were irrelevant to the issues of motive and intent, the only issues in that case for which they were offered. Statements of a victim that are probative of the victim's state of mind may be admissible, however, when that state of mind is independently relevant to other material issues in the case.

We note, for instance, that other jurisdictions have permitted such statements where "the decedent's fear helps to rebut aspects of [an] asserted defense." 2 C. McCormick, Evidence (4th Ed. 1992) § 276, p. 245; see also *State* v. *Riley,* 532 So. 2d 1174, 1177 (La. App. 1988); *State* v. *Magruder,* 234 Mont. 492, 765 P.2d 716, 719 (1988). Therefore, our inquiry in this case must focus on whether the victim's fear of the defendant was relevant to some other material issue.

The defendant claims that the victim's state of mind was irrelevant to the issues at trial because the defendant concededly had killed the victim and because his extreme emotional disturbance defense presupposed an intent to cause her death. The defendant's extreme emotional disturbance defense, however, relied heavily on the testimony of Selig, whose assessment of the defendant's mental capacity was based on the defendant's account of the murder. According to this testimony, the victim first picked up a knife and went into the bathroom with it. When the defendant tried to take the knife away, the victim resisted and cut the defendant. It was at that point that he lost control. Selig testified that the defendant "felt that his life was in danger, that he was being threatened, and that he had to defend himself from that. He felt that she wanted to kill him." On cross-examination, however, Selig acknowledged that his conclusions might have been different had the defendant not been cut first by the victim.

We are persuaded that the assertion of the defendant's extreme emotional disturbance defense put the victim's state of mind into issue. The victim's fear of the defendant was relevant to challenge the defendant's version of the facts by establishing that it was unlikely that the victim, having expressed a grave fear of the defendant in the past, would have behaved aggressively toward the defendant to a point where he felt threatened. "From this evidence of the victim's state of mind, the jury could reasonably infer that, because of her fear of the defendant, it was improbable that she . . . attacked him with a [knife] . . . . While the chain of inferences between the initial proposition and desired conclusion may be somewhat attenuated, we confide matters of relevance to the sound discretion of the trial court." *State* v. *McIntosh,* supra, 163. The testimony of the victim's fear of the defend-

ant offered by the three witnesses, therefore, served to rebut Selig's testimony and to weaken the defendant's extreme emotional disturbance defense.[18] Under these circumstances, the victim's fear of the defendant was relevant.

The judgment is affirmed.

In this opinion PETERS, C. J., CALLAHAN and BORDEN, Js., concurred.

BERDON, J., concurring. I concur in the result reached in part I of the majority opinion. I would not undertake an analysis of whether, under the state constitution, the standard for determining if an emergency existed is probable cause or the objective reasonableness of the officer's belief that an emergency existed. Although the defendant raised the state constitution in his brief, he provides only a general and cursory analysis. The defendant did not claim (other than at oral argument) that probable cause should be the standard under the state constitution. Since the defendant has failed to advance any concrete arguments for separate state constitutional treatment of the issue; see *State* v. *Joly*, 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991); *State* v. *Mercer*, 208 Conn. 52, 67 n.9, 544 A.2d 611 (1988); I would not reach it.

I agree with parts II and III of the majority opinion.

---

[18] We note that the testimony of Sanders was also offered for the impermissible purpose under *State* v. *Duntz*, 223 Conn. 207, 613 A.2d 224 (1992), of establishing the defendant's motive. Unless a limiting instruction would then be required, the fact that an alternate ground for admitting the evidence was proper is sufficient to uphold its admission on appeal. Cf. *Mays* v. *Mays*, 193 Conn. 261, 268, 476 A.2d 562 (1984); *Johnson* v. *Rockaway Bus Corporation*, 145 Conn. 204, 210, 140 A.2d 708 (1958).