[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendant, who is charged with possession of an assault weapon in violation of General Statutes sec. 53-202c, has moved to suppress the assault weapon seized from his home by the Connecticut State Police conducting what they called a "protective sweep" of the defendant's home. For the reasons that follow, the Court denies the motion to suppress.
After an evidentiary hearing, the Court finds the following facts. April 1, 1997 was a day that suffered no fools. Several feet of snow fell in northern Windham County. There were power outages, electrical lines down, and numerous motor vehicle problems. That morning the Troop D barracks of the Connecticut State Police received information that an unknown person was using the two-way radio in a plow truck controlled by the town of Thompson. At approximately 9:21 a.m., the State Police went to the scene, which was located at Town's Lane. Their investigation revealed that earlier that morning the snow plow driver had left the plow on the side of the road so that he could take a rest. The defendant, with his own truck, had then attempted to drive out of the driveway of his home at 24 Town's Lane and collided with the parked plow. The defendant had then entered the plow and used the plow's two-way radio to hurl a tirade of obscenities at the Town concerning the location of the abandoned plow.
The Troopers decided to approach the defendant's home to ask the defendant to move his own truck, which was also blocking the road, and to investigate the situation further. As they began to walk up the defendant's long, uphill driveway, the defendant came out on the second floor deck of his house and, from a distance of several hundred feet, began yelling, swearing, threatening, and making hand gestures at the Troopers in an attempt to make the Troopers leave his property. The Troopers felt threatened and vulnerable because of the defendant's behavior and their location beneath the defendant in elevation. They therefore left the scene. CT Page 6773
During the balance of the morning, the State Police gathered additional information about the defendant. They learned from neighbors and friends of the defendant that he had a "low boiling point," that his behavior had been irrational in the past, that there might be a young girl staying at the residence, and that the defendant had firearms on the premises which he had previously fired from his porch. The Putnam Police reported that the defendant had a prior arrest for either a family violence matter or a matter involving a shotgun.
The defendant himself pursued the matter. Four times that morning the defendant called Troop D. The defendant stated in two of the calls that, in the accident earlier that morning, he had hit his head against the windshield or the side of his truck. The defendant's language in three of the calls was at times harsh, confrontational, and vulgar. In the third call, which the Court listened to by way of a cassette recording, the defendant, in a loud and extremely excited tone of voice, addressed the State Police dispatcher as follows:
 You fucking weak suck. I'm going to fuck you. Fucking pigs up the ass. You understand me. I'm going to get your fucking Trooper. I'm going to fuck him bad with the fucking Feds. Do you hear me mother fucker? I'm going to fuck you with the Feds. Do you hear me? You fuckers tow my truck and fucking destroy it. I'm going to fuck you.
The defendant also called the State Police Commissioner's Office, the Governor's Office, and the State Police Internal Affairs Division that morning to complain about the situation. These three offices in turn called Troop D to advise them that, if Troop D went back to the defendant's house, Troop D should be careful because the defendant had said he would not be arrested and would use any means necessary to prevent arrest.
The investigating officer at Troop D had no intention of going back to the defendant's residence at that time. At about 1:00 p.m. that afternoon, however, a call came into Troop D from a Steven Eckhouse, who identified himself as a friend of the defendant's. Eckhouse told the State Police that he had just spoken to the defendant on the phone, that the defendant was upset, dejected, and, apparently, suicidal or harmful to others.[1] Eckhouse added that his call to the defendant had been cut off and that he had tried several times to call the CT Page 6774 defendant back without success. Eckhouse requested that the State Police send someone out to check on the defendant.
A Trooper attempted to call the defendant but could not get through. At about 1:15 p.m. that afternoon, Trooper Scott Prouty, Lieutenant Thomas Hogarty, and then-Sargent (now Lieutenant) Thomas Lumb went back to the defendant's residence to check on his well-being. They did not have or consider getting a search warrant. Trooper Prouty brought his patrol dog and all three officers wore bulletproof vests or exterior body armor. After ascending the defendant's long driveway, the officers knocked on the front door and several windows of the residence. There was no response. The officers then went up to the second floor deck and wrapped on a sliding glass door. The defendant appeared to be sleeping but eventually got up and came to the glass door. Through the glass door the officers explained that they would like to come in the house to insure his safety but that they were not there to arrest the defendant. The defendant then opened the glass door and let the officers into his second floor living room.
The defendant was calm, lucid, without any apparent injuries, and apologetic for his behavior earlier that day. There were no weapons on the defendant's person or otherwise in plain view. Lieutenant Hogarty concluded that the defendant was not suicidal and that detention of the defendant for an emergency commitment examination was not necessary. See General Statutes § 17a-503
(a). When asked, the defendant stated that there was no one else in the house.
The officers were nonetheless concerned that their own safety and the safety of others was at stake and that the defendant could behave erratically again. Without asking for permission, Sergeant Lumb conducted what he called a "protective sweep" of the residence while Trooper Prouty stood by the defendant with his patrol dog. Lumb went downstairs and proceeded to walk through the entire house. Lumb returned to the second floor and went into the upstairs bedroom from which the defendant had originally emerged. The bedroom was about ten to twelve feet away from the living room area where the defendant stood with Trooper Prouty. Lumb opened a closet door in the bedroom and found two or three rifles and shotguns, some ammunition, and some clips or magazines to hold the ammunition. Lumb realized that some of the clips were for an AR-15 rifle that was not present in the closet. Lumb therefore looked under a nearby bed and found a box containing an CT Page 6775 AR-15.
The officers seized all the weapons and told the defendant that he could pick them up at Troop D within a week. The defendant was not arrested at that time. Apparently upon later examination, the officers concluded that the AR-15 was an illegal assault weapon. The defendant was arrested by warrant for possession of an illegal assault weapon in violation of General Statutes § 53-202c.
 I
The State seeks to justify the search and seizure under the "exigent circumstances" or "emergency" exception to the search warrant requirement. It is not necessary, however, to justify the initial entry into the defendant's home under the emergency exception because the Court finds that the police obtained entry by consent. The ultimate question in determining whether a person consents to the police entry of his property is "whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice." State v. Vargas,34 Conn. App. 492, 496-97, cert. denied, 230 Conn. 907 (1994) (internal quotations omitted). Under any applicable burden of proof, the Court finds that the State established that the will of the defendant, who was calm and lucid at the time, was not overborne in granting consent to the State Police to enter his house.
 II
The closer question is the validity of the search for weapons once the defendant consented to police entry to his home. There is no dispute that the police did not have a warrant to search, that the defendant did not consent to a search, and that the search exceeded the confines of a warrantless patdown of a suspicious person under Terry v. Ohio, 392 U.S. 1 (1968). SeeState v. Gant, 231 Conn. 43, 64-66 (1994). The justification for the search and seizure in this case must come, if at all, from the exigent circumstances exception to the warrant requirement. Our Supreme Court has recognized that neither the Federal nor the State Constitution:
bar[s] police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid . . . The extent of the search is limited, involving CT Page 6776 a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search.
State v. Blades, 225 Conn. 609, 617-18 (1993); State v. Geisler,222 Conn. 672, 690-91 (1992) (internal quotations omitted).
The standard regulating warrantless searches pursuant to the emergency doctrine is reasonableness, not probable cause. Statev. Blades, 225 Conn. at 622. The state bears the burden of demonstrating that the search was reasonable. Id. at 618. As the Supreme Court stated in State v. Blades, 225 Conn. at 618-19
 An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home . . . The police must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . The test is not whether the officers actually believed an emergency existed, but whether a reasonable officer would have believed that such an emergency existed . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry.
State v. Blades, 225 Conn. at 618-19 (internal quotations omitted; emphasis in original).
The emergency doctrine is rooted in the "community caretaker function of the police rather than its criminal investigatory function." Id. at 619. The emergency doctrine:
 serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life.
Id. As the State points out, the police have been found civilly CT Page 6777 liable for their failure to perform an affirmative duty to protect the citizenry. See. e.g., Thurman v. City of Torrington,595 F. Sup. 1521 (D. Conn. 1984) (failure to protect woman from assaults by her husband).
There are an infinite variety of situations in which the emergency exception has justified a warrantless entry and search.See State v. Blades, 225 Conn. at 619-20; 3 W. LaFave, Search and Seizure (3d ed. 1996) sec. 6.6(a), pp. 396-400. Several of these situations involved a warrantless search for weapons. In State v.Gant, 231 Conn. at 64-69, our Supreme Court held that exigent circumstances justified a warrantless search, exceeding the scope of a Terry pat down, of an area in an apartment from which a suspect might have gained possession of a gun that could have harmed the officers and others within the apartment. In UnitedStates v. Antwine, 873 F.2d 1144, 1145-47 (8th Cir. 1989), the Eighth Circuit approved a warrantless entry into and search of a house, including a partially opened dresser drawer, for other people and for a gun that the defendant, who was arrested outside, had earlier brandished inside the house, because the agents were legitimately concerned for the safety of children remaining inside. See also United States v. Al-Azzawy,784 F.2d 890, 895 (9th Cir. 1985), cert. denied, 476 U.S. 1144 (1986) (warrantless search of defendant's trailer for firearms and explosives justified because police were not able to arrest all of the persons, particularly the defendant's two small children, entitled to enter the trailer).
In the present case, several factors combine to validate the State Police action as a legitimate emergency search. First is the hostile, unpredictable, and explosive behavior of the defendant towards the police on April 1, coupled with the reports from the defendant and others that the defendant had hit his head and was extremely upset. In addition, the police had learned of the defendant's past history of the use of firearms and other aggressive and irrational behavior. When the police entered the defendant's home around 1:15 p.m. on April 1, they reasonably concluded that the defendant was dangerous.
The defendant argues that his behavior upon entry of the police revealed a more settled, even apologetic, demeanor, thus giving rise to a duty by the police to withdraw. The defendant relies on State v. Geisler, 222 Conn. at 695-96, in which our Supreme Court held that a warrantless entry into the home of a defendant, suspected of assault with a motor vehicle, was not CT Page 6778 justified under the emergency exception because there was little evidence that the defendant had suffered any serious injuries and, even if the initial entry was justified, the police should have withdrawn once they learned that the defendant was physically well. The Court finds Geisler distinguishable because it did not involve a suspect with both a past history and a recent display of dangerousness, as does the present case. While it is extremely difficult to predict violent behavior, past dangerousness is an important harbinger of future problems. See State v. Cuvelier,175 Conn. 100, 109 n. 5 (1978). The State Police could reasonably have concluded that the defendant, although calm when they entered, could readily revert to the tumultuous behavior he exhibited that morning.[2]
The belief that the defendant was dangerous meant not only that he may be dangerous to himself, but also that he may be dangerous to others, of prime significance in the case law is the possibility, which existed in this case, that there might be a young child in the house. See e.g., State v. Gant,231 Conn. at 68 ("The combination of guns and children can be fatal"). The safety of the police was also at issue, especially given that, in leaving the defendant's residence, the police would have to descend a long, hilly driveway that the defendant could overlook from his second floor deck. The seizure of the defendant's firearms becomes more reasonable in view of these concerns.
A second factor is that the police were legitimately exercising a community caretaking function. State v. Blades,225 Conn. at 619. There is no evidence that the entry into and search of the defendant's house was a subterfuge for a criminal investigation. To begin with, the State Police did not desire to return to the defendant's house, despite his verbal harassment and threatening behavior toward them, but only did so at the request of Stephen Eckhouse, who believed the defendant needed help. While there is no evidence that the courts were closed or that the police were otherwise unable to obtain a warrant, there was no basis to obtain a warrant, because the police did not intend to search the defendant's house for evidence of a crime. Nor did the State Police intend to arrest the defendant. They told the defendant that they did not intend to arrest him and they did not do so. The police gained entry by consent, thus reducing the scope of the intrusion. Cf. id. at 614-21 (forcible warrantless entry to determine if victim of crime needed assistance). The police told the defendant that he could pick up his firearms in a week, a statement that reveals CT Page 6779 the police were more interested in resolving a community crisis than building a criminal case against the defendant.
Finally, the scope of the search was "strictly circumscribed by the emergency which serve[d] to justify it." State v. Blades,225 Conn. at 618. The challenged police action was more of a sweep or cursory search than the usual full-blown search.[3] The police looked only in places likely to contain a gun. They did not rifle through drawers, papers, or other irrelevant personal effects. Once the police found and recognized the ammunition for the AR-15, it was reasonable for them to look under a nearby bed and in a box likely to contain the firearm itself. For all these reasons, the Court finds that the emergency search of the defendant's home was reasonable and therefore valid under the State and Federal Constitutions.
The motion to suppress is denied.
Schuman, J.