Gary L. **VITEK**, Appellant
(Defendant below),

v.

**STATE** of Indiana, Appellee
(Plaintiff below).

No. 02S00–0002–CR–109.

Supreme Court of Indiana.

June 29, 2001.

⌾⇌30(1)

Stanley L. Campbell, Fort Wayne, IN, Attorney for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

We affirm Defendant Gary Vitek's murder conviction for his role in killing a man and burying his body in cement. We find that Defendant's actions after the killing constituted sufficient evidence to convict. Because the police were conducting a valid missing person investigation, we reject his argument that there was an illegal warrantless search. And because Defendant claimed cooperation with police, we affirm the State's use of his refusal to give a videotaped statement.

## Background

The facts most favorable to the verdict indicate that on January 7, 1999, Defendant was staying at David Carter's residence. Anthony Bennett came over to purchase crack cocaine, but Carter refused to give him any crack because Bennett didn't have any money. Sometime shortly thereafter, Bennett shot Carter with a shotgun, killing him. Defendant and Bennett then smoked Carter's crack. They also found $160 that belonged to Carter and used it to buy more crack. They wrapped Carter's body up in a rug and left it in the hallway for several days. Eventually, Defendant and Bennett decided to hide Carter's body. They rented a jackhammer and used it to dig a hole in the basement. Then they put the body in the hole and poured lime over it and finally covered it up with dirt and cement.

Defendant was charged with Murder[1] and Failure to Give Notice of Violent or Suspicious Death, a Class D Felony.[2] A jury found Defendant guilty of both counts. The trial court sentenced Defendant to concurrent sentences of 60 years for the murder and one and a half years for failure to give notice.

We will recite additional facts as necessary.

## Discussion

### I

■ Defendant contends that the trial court erred in denying his motion to suppress. Defendant requested that the court suppress evidence that was obtained as a result of a warrantless search of Defendant and Carter's residence.

Because Carter's ex-wife Tina Crozier had not heard from him, she called Detective Wilson on January 18, 1999. She informed Wilson that she had not seen Carter since December 31 and she was worried about his well-being. Carter had suffered from a number of physical disabilities, including excessive weight, a knee injury, sleep apnea, and a heart problem that required him to use an oxygen machine. Because of these disabilities, he did not leave the house very often or for more than a few hours at a time.

Wilson, following standard procedure, told Crozier to wait a few days and that she should call back if she still had not heard from Carter. Crozier called again on January 20. Wilson went to Carter's house and knocked, but received no answer. He returned 45 minutes to an hour later and left his card in the door. On the back of his card he left a note for Carter to call him. Wilson later received a voice mail from a man claiming to be Carter, but Crozier identified the man on the voicemail tape as Defendant.

Wilson entered Carter's house, looking for him. When he looked in the basement he found a mound of dirt and newly poured concrete in a three feet by six feet area. He also noticed empty cement bags and chunks of old cement that he believed had been in the floor where the new concrete now lay. At this point, Wilson left the house because he felt "there might be something wrong there." Wilson then called homicide detectives who took over the case. Before re-entering Carter's residence to search for evidence of a crime, the officers obtained a search warrant.

■ Generally, officers must obtain a search warrant to search a person's house. U.S. Const. amend. XIV; *Jewell K. Krise v. State*, 746 N.E.2d 957, 961 (Ind.2001). One well recognized exception to the warrant requirement is for an entry under

---

**1.** Ind.Code § 35–42–1–1 (1998).

**2.** *Id.* § 36–2–14–17 (1998).

emergency circumstances. *See United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951). It is not necessary for police to have a warrant to enter a residence when the circumstances suggest a reasonable belief that a person within the premises is in need of aid. *See Stewart v. State*, 688 N.E.2d 1254, 1257 (Ind. 1997). And we have previously recognized that there can be a reasonable belief that a person may be in need of aid within a premises when the occupant has been missing. Most cases upholding this exception have found that a person's absence, combined with other circumstances, have created the exigent circumstances necessary for a warrantless search. For example, in *Geimer v. State*, this court upheld an entry upon a "reasonable belief that a person within the premises [was] in need of aid" where "it was unlike [the victim] to leave town for a period of time without notifying anyone." 591 N.E.2d 1016, 1019 (Ind.1992). Other courts have also recognized that warrantless searches may be appropriate to seek an occupant reliably reported missing. *See* 3 Wayne R. La-Fave, *Search and Seizure* § 6.6(a) (1996) at 396; *United States v. Presler*, 610 F.2d 1206 (4th Cir.1979) (upholding warrantless search where defendant's landlady had not seen him for some time and an unusual odor was emanating from his room); *State v. Blades*, 225 Conn. 609, 626 A.2d 273 (1993) (upholding warrantless search where victim's relatives worried about her whereabouts and she had been involved in a troubled marriage and her mother believed her husband had harmed her).

The circumstances of this case support Wilson's search of Defendant and Carter's home. The trial court found that "[t]he facts within the knowledge of Detective Dale Wilson ... constitute probable cause to believe that [Carter] was upon the premises ... and may have been in need of aid." Carter had reliably been reported missing. He suffered from various ailments that kept him in or near his residence, making it reasonable to think that he was at home. Furthermore, due to his disabilities, it was reasonable to think that Carter might be in imminent need of medical assistance.

Although the warrant requirement is relaxed somewhat where, as in this case, there is a legitimate missing persons claim, there is no unlimited "missing persons" exception. Even in a missing persons case, there must be exigent circumstances to justify a warrantless search. In this case, it appears that Detective Wilson was legitimately searching for a missing person that he thought might be in need of aid. When he found evidence of foul play, he left the residence and turned the case over to homicide detectives. And as previously noted, before re-entering Carter's residence to search for evidence of a crime, the officers obtained a search warrant.

## II

█ Defendant contends that the trial court erred in allowing the State to present evidence that Defendant refused to give a videotaped statement. Appellant's Br. at 22.

The police interviewed the Defendant after reading him his *Miranda* rights. Defendant provided a substantial amount of information about the murder and the events afterward. At the conclusion of the interview, the police asked Defendant to make a videotaped statement and Defendant declined.

Prior to the start of the trial, the trial court granted Defendant's request to bar any reference to his refusal to give a videotaped statement. During trial, defense counsel cross-examined the State's witness, Detective Hamilton, regarding Defendant's confession. The questions in-

volved the facts that Defendant had admitted to the police:

[Defense Counsel]: And he freely admitted to you, did he not, that he had participated in afterwards, the concealment of Mr. Carter's body?

[Detective Hamilton]: That is correct.

(R. at 508.)

During re-cross-examination, defense counsel continued to elicit information regarding Defendant's disclosure of information to the police:

[Defense Counsel]: And he freely told you about his involvement and what he had done after Bennett had shot Carter?

[Detective Hamilton]: Yes.

[Defense Counsel]: Told you he had went and rented an air hammer.

[Detective Hamilton]: True.

[Defense Counsel]: Told you he had sold the shotgun to Roger Rice.

[Detective Hamilton]: True.

[Defense Counsel]: Told you everything about what had happened that turned out to be true, right?

[Detective Hamilton]: Yes.

(R. at 514–15.)

After this cross examination, the court reconsidered Defendant's initial request to exclude from trial the fact that Defendant had refused to record his statement. The trial court decided that defense counsel's cross-examination had opened the door to the otherwise excluded evidence.

■ A person in custody who is questioned by the police has the right to remain silent and, in general, a criminal defendant may not be penalized at trial for invoking the right to remain silent. *See*

*Doyle v. Ohio,* 426 U.S. 610, 619–620, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); U.S. Const. amend. XIV. Even when an individual waives that right, the right may be invoked at any stage of the interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 445, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Using a defendant's post-*Miranda* silence to impeach a defendant at trial violates the Due Process Clause of the Fourteenth Amendment. *See Doyle,* 426 U.S. at 619 620, 96 S.Ct. 2240.[3]

■ Although evidence of a defendant's post-*Miranda* silence is generally not admissible, the defendant may open the door to its admission. The *Doyle* Court acknowledged this in its decision, stating "[i]t goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." *Doyle,* 426 U.S. at 619–20, 96 S.Ct. 2240. As we explained in *Willsey v. State:*

[T]he central constitutional inquiry is the "particular use to which the post-arrest silence is being put.... *Doyle* does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor."

698 N.E.2d 784, 793 (Ind.1998) (quoting *Lindgren v. Lane,* 925 F.2d 198, 202 (7th Cir.), *cert. denied,* 502 U.S. 831, 112 S.Ct. 105, 116 L.Ed.2d 74 (1991)), *reh'g denied.* It follows that the prosecutor may introduce a defendant's post-*Miranda* silence in

---

**3.** "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his

trial testimony." *Lynch v. State,* 632 N.E.2d 341, 342 (Ind.1994). (quoting *Wainwright v. Greenfield,* 474 U.S. 284, 292, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986))

limited circumstances as long as it is not used to exploit a defendant's constitutional rights.

Other jurisdictions have found that a prosecutor may bring in a Defendant's post-*Miranda* silence where the defense has introduced evidence that the defendant cooperated fully with police. *See United States v. Vega*, 589 F.2d 1147 (2d Cir.1978); *Stone v. Estelle*, 556 F.2d 1242 (5th Cir. 1977), cert. denied, 434 U.S. 1019, 98 S.Ct. 742, 54 L.Ed.2d 767 (1978); *United States v. Fairchild*, 505 F.2d 1378 (5th Cir.1975). In *Fairchild*, the Fifth Circuit Court of Appeals held that a defendant's post-*Miranda* silence was admissible to rebut the defendant's insinuation that he had cooperated with the police. 505 F.2d at 1383. The defendant's counsel attempted to create this impression when he asked one of the government's witnesses, "During the period of time that this investigation has been going on, to your knowledge has [the defendant] cooperated fully with the FBI and U.S. Attorney's office in responding with anything that you all wanted?" *Id.* The Court of Appeals held that evidence of the defendant's silence was admissible "for the purpose of rebutting the impression which he attempted to create: that he cooperated fully with the law enforcement authorities." *Id.*

Here, the trial court properly granted Defendant's motion to bar evidence of his refusal to give a videotaped statement. Defendant's initial waiver of his right not to be interrogated was not a wholesale abdication of his privilege against self-incrimination. *See Miranda*, 384 U.S. at 445, 86 S.Ct. 1602 ("The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.");

*Elsten v. State*, 698 N.E.2d 292, 294 (Ind. 1998) (holding that a suspect who initially waived his right to counsel could reassert it at any time during the interrogation). Defendant had the right to refuse to be interrogated, whether it was a refusal to answer any questions or a refusal to answer any questions while being videotaped. As such, Defendant's refusal to make a videotaped statement was a valid assertion of his privilege against self-incrimination. In this regard, the trial court's barring evidence of Defendant's refusal to make a videotaped statement was an appropriate protection of Defendant's post-*Miranda* silence.

The trial court's decision, later in the trial, to permit evidence of Defendant's refusal to make a videotaped statement was also proper. The trial court found that it was defense counsel's intent on cross-examination "to convey [Defendant's] candor, honesty [and] cooperation...." The court stated that "the implication was very clear, very loud and clear that through the series of questions asked of and answered by Detective Hamilton that [Defendant] was open and honest and cooperative...." Because Defendant elicited evidence to suggest that he had cooperated, it was appropriate for the prosecution to introduce that evidence for the limited purpose of rebuttal.

The court limited the State's ability to introduce the evidence, stating, "I don't expect the State to dwell on [Defendant's refusal]." The court also emphasized that the information was "not appropriate for lengthy comment or for the State to dwell upon it or its ramifications...." Because the evidence was introduced to rebut Defendant's implication that he cooperated and it was limited to that purpose only, we find that the trial court did not err.

Defendant also complains that, during its closing argument, the State revisited

the issue of Defendant's refusal to make a videotaped statement.[4] Defendant, however, did not object to this statement, and therefore did not preserve the issue for appeal. *See Wright v. State,* 690 N.E.2d 1098, 1111 (Ind.1997) (holding that to preserve an issue regarding the propriety of a closing argument for appeal, a defendant must make a prompt objection to the argument; if overruled, request an admonishment; and, if further relief is desired, move for a mistrial), *reh'g denied; Gibbs v. State,* 483 N.E.2d 1365, 1368 (Ind.1985) ("A contemporaneous objection is required for appellate review.").

Although we do not need to rule on this issue, we believe it was consistent with the limitations the trial court placed on the use of the video-tape refusal for the State to touch on the issue of Defendant's cooperation during closing argument. It was only a brief reference to a fact that was already in evidence.

### III

Defendant also contends that there was insufficient evidence to support his conviction for murder.

In reviewing a sufficiency of the evidence claim, the Court neither reweighs the evidence nor assesses the credibility of the witnesses. *See Garland v. State,* 719 N.E.2d 1236, 1238 (Ind.1999) *reh'g denied.* We look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. *See Sanders v. State,* 704 N.E.2d 119, 123 (Ind.1999). We will affirm the conviction if there is probative evidence from which a reasonable jury could have found Defendant guilty beyond

a reasonable doubt. *See Brown v. State,* 720 N.E.2d 1157, 1158 (Ind.1999).

A "person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense. . . ." Ind.Code § 35–41–2–4 (1998). Therefore, one who intentionally aids, induces, or causes another person to commit murder is also guilty of murder. *See Ledo v. State,* 741 N.E.2d 1235, 1238 (Ind.2001). It is not necessary for the jury to infer that a defendant participated in every element of the crime. *See Wright,* 690 N.E.2d at 1106–07; *Fox v. State,* 497 N.E.2d 221, 227 (Ind.1986). We will affirm the conviction if, at the very least, there is probative evidence from which a reasonable jury could have concluded that Defendant aided, induced, or caused Bennett to kill Carter.

For the purposes of accomplice liability, we consider the following factors when determining whether a defendant aided another in the commission of a crime: (1) presence at the scene of the crime; (2) companionship with another at scene of crime; (3) failure to oppose commission of crime; and (4) course of conduct before, during, and after occurrence of crime. *See Kelly v. State,* 719 N.E.2d 391, 396 (Ind.1999) *reh'g denied; Wright,* 690 N.E.2d at 1106.

The fact that a person was present at the scene of a crime and did not oppose the crime is not sufficient by itself to convict him or her of murder. *See Burkes v. State,* 445 N.E.2d 983, 987 (Ind. 1983); *Harris v. State,* 425 N.E.2d 154, 156 (Ind.1981). However, the jury may consider a defendant's presence at and

---

4.  During its closing, the State argued:
    [H]is purpose was to give him enough facts and divert suspicions from himself onto [Bennett]. And he's so cooperative with the police that when [the detective] says, okay, this is a great thing, how would you like to have it video taped. He refused to have his statement memorialized on a video tape. This is not somebody who's cooperating. (R. at 664.)

acquiescence to a crime, along with other facts and circumstances, to find that the defendant participated in the offense. *See Garland v. State,* 719 N.E.2d 1236, 1238 (Ind.1999); *Harris,* 425 N.E.2d at 156. There is no bright line rule in determining accomplice liability; the particular facts and circumstances of each case determine whether a person was an accomplice. *See Peterson v. State,* 699 N.E.2d 701, 706 (Ind.Ct.App.1998).

In this case, Defendant acknowledged his presence at the scene of the crime, but argues that he was not involved in the murder. Defendant told police that he was in the basement when Bennett shot Carter. He stated that after the murder he tried to leave the residence, but Bennett chased him and would not let him leave.

In addition to his presence, Defendant's actions after the crime also implicate him. First, Defendant shared in the fruits of the crime; he and Bennett took Carter's money and used it to buy cocaine; Defendant also sold Carter's truck. Second, Defendant concealed evidence by helping to bury the body, and went so far as to borrow a jackhammer from a friend. Third, it was Defendant, not Bennett, who disposed of the murder weapon. Finally, Defendant purposefully tried to mislead the police by posing as Carter on the phone. Throughout Defendant's activities, he could have taken the opportunity to go to the police. Instead, he chose to continue covering up the crime and selling the victim's belongings.

In this respect, this case resembles *Hauk v. State,* 729 N.E.2d 994, 998 (Ind. 2000), where the defendant was convicted of murder under an accomplice liability theory. She testified that she stole money from the victim and hid one of the murder weapons, but insisted that she only observed the murder and did not participate.

We found that there was sufficient evidence for a jury to infer her complicity in the crime and find her guilty of murder, even if the jury's decision was based solely on her actions after the crime that she described in her testimony. *Id.*

Finally, Defendant also made a statement that jurors could have construed to be a confession. Detective Wayne Kelly, who interviewed Defendant, testified at trial that he had asked Defendant "what was the reason for doing this." Detective Kelly stated that "[Defendant] indicated that they, meaning he and [Bennett], had done this because they wanted to get [Carter's] dope from him." On cross-examination, Detective Kelly indicated that Defendant made that statement while they were discussing what occurred directly after the murder. Defendant contends that the "statement in no way serves as any confirmation that [Defendant] knew or participated in the killing of Carter" and only goes "to prove that [Defendant] searched the house to find Carter's cocaine after the killing had occurred." Appellant's Reply Br. at 2. While the statement may not be a confession, it is additional evidence that tends to implicate Defendant.

A jury could infer from Defendant's presence at the crime scene, actions after the crime, and statements to police that he knowingly or intentionally aided Bennett in killing Carter.

*Conclusion*

We affirm the judgment of the trial court.

SHEPARD, C.J., and DICKSON, J., concur.

BOEHM, J., dissents with separate opinion in which RUCKER, J., concurs.

BOEHM, Justice, dissenting.

I believe the evidence is sufficient to convict Vitek of assisting a criminal and other offenses, but insufficient to establish knowing or intentional killing. Accordingly, I respectfully dissent. Unlike other similar cases, I find no evidence here of concerted action before the killing.

RUCKER, J., concurs.