

FILED

Mar 19 2018, 5:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Isiah L. Barker,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 19, 2018

Court of Appeals Case No.
45A03-1701-CR-123

Appeal from the Lake Superior
Court

The Honorable Samuel L. Cappas,
Judge

Trial Court Cause No.
45G04-1211-MR-12

**Brown, Judge.**

[1] Isiah L. Barker appeals his convictions for murder and feticide as a class B felony. Barker raises one issue which we revise and restate as whether the trial court abused its discretion in admitting certain evidence. We affirm.

## Facts and Procedural History

[2] In June 2011, Cynthia Funches, a certified nursing assistant employed at Renaissance Park South, was in a relationship with Barker and was pregnant with his child. Funches lived in an apartment in Highland, Indiana, and her lease listed her as the only resident and provided in part that "[t]he premises shall be occupied solely for residential purposes by Resident and those persons listed in the Application for the Lease" and that "[v]isitors will be limited to 2 persons staying with Resident for a maximum of 14 days, whether consecutive or individually during each year of the Lease term." State's Suppression Hearing Exhibit 3. Funches listed Barker as her emergency contact on her application for residency and his address as 9350 South Green.

[3] On June 21, 2011, Funches called Genett Clay, a nurse, and told her that she wanted to call off from work because she was bleeding and needed to go to the hospital. Clay heard a male voice instructing Funches to "hang up the damn phone, because we have to go." Trial Transcript Volume 2 at 34. Funches called Clay again, and Clay heard the same male voice state: "I don't have time for this shit. Hang up the phone. We have to go to the hospital." *Id.*

[4] Around 11:00 p.m. on June 21, 2011, Vivian Pettigrew, who lived in the same apartment complex as Funches, left her apartment and went to her car to

retrieve her laundry. She observed two men coming down the stairs with a bin and recognized one of the men as Funches's boyfriend, Barker. Pettigrew made eye contact with Barker, he "ducked his head real quick," and "it troubled [her] spirit." Trial Transcript Volume 3 at 186, 202. She observed the men struggle with the bin and head towards a green Caravan that Pettigrew recognized as the same Caravan that Barker had previously driven. She also observed that the Caravan had two mattresses on top.

[5] On June 22, 2011, Funches's sister, Shaunte Ruth, called the office of Funches's apartment complex, told a woman that she was trying to contact her sister and had not heard from her, and asked if she would go to the apartment and see if she received a response at the door. Laura Newton and her co-worker, Pamela Heeringa, went to Funches's apartment, knocked on the door, received no response, and then entered the door using a key.

[6] Heeringa found the apartment in "complete disarray." Transcript of Suppression Hearing Volume 2 at 10. Newton and Heeringa looked for Funches, but did not find her. They observed a rolled-up carpet in the living room and that the carpet was missing from the dining room and the hallway area. Newton went into the dining room and down the hall where she could see in the bedroom and the bathroom and "went to where [she] would have been able to see [Funches] if she had been there." Trial Transcript Volume 2 at 94. Newton observed that there was furniture located in various areas of the apartment where it should not have been such as a dresser in the kitchen and

that the apartment looked like it had been ransacked. Heeringa locked the door, returned to the leasing office, and called the police.

[7] Highland Police Officer Brandon Norris received a dispatch regarding a welfare check or "[c]hecking the wellbeing of somebody that somebody hasn't had contact with in a little while or something of that nature." *Id.* at 121. Officer Norris spoke with the apartment employees, and they gave him information as to the apartment that he needed to check. At some point, Highland Police Officer Wright also arrived. The leasing agents informed Officer Norris that "a female had not been seen or heard from in a while, so they were going to let [them] into the apartment, if we could have a welfare check on her." Transcript of Suppression Hearing Volume 2 at 162. The leasing agents mentioned to Officer Norris that they had "peeked in and seen some things which then led them to believe that they should back out and call the police." *Id.* One of the leasing agents told Officer Norris that there were blood stains on some rolled-up carpet inside the apartment. Officer Norris inquired whether there were any co-tenants that lived there at that time and was advised that Funches was the only lessee. Heeringa let the officers into the apartment.

[8] When Officer Norris first entered the apartment, he saw that the door trim looked as if it had been damaged. He observed that "everything was stacked up in the kitchen" and "everything was in disarray," and the officers proceeded in "to make sure that there was no – nothing – you know, foul play or anything – anything crazy inside, because just how things were stacked up and everything was in disarray, and it looked a little suspicious." *Id.* at 165. Officer Norris

called out "Hello Highland Police" to make sure no one was present and, as he and Officer Wright were going down the hallway, they noticed other things out of place or out of the ordinary. *Id.* at 168. Officer Norris smelled an odor "that could be recognizable as a cleaning product or bleach" and observed that the kitchen was full of furniture and what he thought was rolled-up fragments of carpet in the living room. Trial Transcript Volume 2 at 146. The bedroom did not have any mattresses or carpet, stains were present on the floor, and the closet mirror was cracked. Officer Norris believed he was standing in a crime scene. He canvassed the entire apartment and did not find Funches. He "went over to the carpet, pulled a piece or two and rolled it back and noticed immediately that there was some blood stain on the carpet." Transcript of Suppression Hearing Volume 2 at 175. Officer Norris then saw Corporal Potesta, his immediate supervisor, standing at the front of the apartment. Corporal Potesta took a look and then said, "[A]ll right, let's – no more touching anything. Let's call Detective Santino." *Id.* Officer Norris then stayed in the immediate hallway outside the door to secure the scene and spoke to Highland Police Detective Mark Santino when he arrived.

[9] After speaking briefly with the family and with the knowledge that Funches apparently had been out of contact with her family and missing, Detective Santino entered the apartment as a "follow-up with patrol for their welfare check" or "an extension of their welfare check." *Id.* at 42. At that time, Detective Santino believed that Funches was alive. During his walkthrough of the living room, kitchen, and hallway, Detective Santino did not see a cot, a

sleeping bag, or anything to indicate that someone was staying there that day. The apartment appeared abandoned "[f]or all practical purposes."[1] *Id.* at 85. In the bedroom, Detective Santino observed that there was not even a mattress or box spring and it did not appear to him that anyone was staying in the bedroom. Detective Santino also observed some sort of dark substance on the concrete which he believed to be blood, a couple of speckles of blood in the hallway, and a bucket with a liquid and a rag inside that had a red-like substance on it. Detective Santino did not collect any property during that initial walkthrough. He told a patrolman to close the door and secure it.

[10] Detective Santino asked Heeringa who was on the lease, and she confirmed that Funches was the leaseholder. Detective Santino had contact with Funches's family and learned that Funches might be in the company of Barker and that she was potentially being held against her will. Detective Santino was not sure if the victim was deceased or still alive, and he then called the Lake County Crime Lab to obtain a second opinion and start processing the apartment with the goal of finding Funches. The crime lab took photographs of

---

[1] At the suppression hearing, Detective Santino was asked during cross-examination: "You made some speculation earlier in your testimony that you believe the apartment appeared to be abandoned, is that correct?" Transcript of Suppression Hearing at 113-114. He answered: "Abandon slash disarray." *Id.* at 114. When asked if it was his assumption that the apartment was abandoned, Detective Santino answered: "I mean it's a hard question to answer because, again, it's – I can tell you what my personal observations were. And I guess it's going to be, you know, what each individual's opinion. To me it was just – you know, it was – there was a lot of things out of place. It would not be indicative of a regular apartment." *Id.*

the apartment and collected pieces of carpeting, a piece of paper, and swabs of an unknown red substance.

[11]   Meanwhile that same day, Chicago Police Detective Stan Kalicki responded to a call regarding a body found in a garage in Chicago by a homeowner. Detective Kalicki arrived at the scene and observed it to be an abandoned house and garage. The homeowner informed the police that he had arrived there earlier in the day and observed the side door that he had just screwed shut was kicked up and a padlock had been placed on it to prevent access. The homeowner cut off the lock, entered the garage, opened a plastic tote container, and discovered a body. The police observed that the body had a uniform for Renaissance Rehabilitation Center, contacted the Center, and learned that Funches was employed there but was not there that day. The police observed a tattoo on the forearm and tentatively identified the body as Funches. It was later determined that Funches suffered stab wounds and died from multiple blunt force trauma[2] and the fetus within her died from asphyxiation anoxia.

---

[2] When asked for his conclusion as to the cause of death, Dr. John Feczko testified: "So I would have called it, just as the Cook County coroner or pathologist did, multiple blunt force trauma, but the main vital blow – a lot of these stab wounds are very superficial, but the main blow that would have resulted in death would have been the strike on the head resulting in subarachnoid and subdural hemorrhage of the brain, which causes you to stop breathing. You cannot get oxygen in. Obviously, multiple blunt force trauma." Trial Transcript Volume 5 at 90. When asked on cross-examination if Funches died from multiple injuries or just one, Dr. Feczko answered: "I would say that the fatal blow is the injury to the head." *Id.* at 100. He later stated: "On the report, I would have signed it out the same way, multiple blunt force trauma. Because with multiple blunt force trauma, you can have bleeding that can result in loss of blood and, you know, death from, again, asphyxia, not having oxygen, but certainly, that and the head injury was the cause of death." *Id.* at 107.

[12] Approximately "[a]n hour, ninety minutes," after Detective Santino arrived at Funches's apartment, Chicago Police called Detective Santino and informed him that there was a tentative identification of a body found as being Funches based on tattoos of the victim. Trial Transcript Volume 3 at 28.

[13] After the crime lab left and after Detective Santino learned that Funches was presumed dead, Officer Norris went back into the apartment and collected some pieces of evidence left behind by the crime lab. Detective Santino learned that Officers Norris and Munoz looked through some papers including a Highland Police traffic ticket and a ticket issued to Barker which listed Barker's address as 8350 South Green in Chicago. The police recovered a number of documents from the apartment including: a document containing a picture of Barker's identification listing his address as 8350 South Green in Chicago; a receipt dated May 20, 2010, for a vehicle tow for the City of Chicago listing Barker's address as 8350 South Green in Chicago; and a credit card statement for a time period of January 7th to February 5th, 2011, addressed to Barker listing his address as 8350 South Green Street in Chicago. Also on June 22, 2011, police impounded Barker's minivan found in Chicago.

[14] On June 23, 2011, Highland Police Detective Lester John Siple prepared a warrant on the basis that the investigation went from a welfare check to a homicide investigation. The warrant was signed by a judge and issued at 11:13 a.m. That day, Indiana State Police Trooper Scott Gilbert focused on the blood stain evidence and collected swabs and a piece of drywall.

[15] Also on June 23, 2011, La Porte County Sheriff Captain Patrick G. Cicero, a member of the International Association of Bloodstain Pattern Analysts, responded to Funches's apartment and completed a bloodstain pattern analysis. Captain Cicero took photographs of the apartment including a photograph of the floor with a "fairly significant[,] stain, reddish brown in color" on the concrete floor and bloodstains on the wall. Trial Transcript Volume 4 at 24. Captain Cicero observed wooden tack strips for carpeting on the concrete floor, but the carpeting was not present. He also observed the glass on a panel of a folding closet door was cracked and there was dried blood in the channel or track of the door. He determined that the mirror had evidence of bloodstains that had been cleaned, and determined the presence of blood in the bedroom, hallway, and bathroom. He also determined that there were impact patterns in the bathroom and cast off patterns in the hallway.

[16] The police learned that Barker dropped off a minivan that he typically drove with an Illinois license plate to Towanna Johnson's house in Chicago and took her green Taurus which had an Illinois license plate. The Taurus contained a parking permit with an expiration date of June 30, 2011, affixed to the windshield so the vehicle could be legally parked in Chicago. The police discovered a sixty pound bag of Quickrete concrete in the passenger seat as well as a spray cleaner and a brand new brush. In the rear seat of the vehicle, the police discovered a brand new bucket, a brand new gallon sized jug of Liquid Fire, and sulfuric acid. The police determined that these items were purchased from a True Value Hardware Store in Chicago and the bin in which Funches's

body was discovered was purchased at Walmart. Video surveillance from these stores showed Barker and Octavius Barlow, Barker's childhood friend. Detective Santino also discovered that there was "a flurry of cell phone activity between" the cell phones of Barker and Barlow from midnight or the late night hours of June 21st into the early morning hours of June 22nd. Trial Transcript Volume 3 at 55.

[17] On November 1, 2012, the State charged Barker with Count I, murder, and Count II, feticide as a class B felony. On October 7, 2013, Forest Park Police Officer Joseph Carrico executed a traffic stop on a vehicle in which Barker was traveling as a passenger in Georgia. When Officer Carrico asked Barker for his name, Barker told him it was Zoe Lyons. Barker attempted to flee but was eventually arrested.

[18] On February 10, 2015, Barker filed a motion to suppress evidence seized from "Defendant's apartment located at 9059 Southmoor Street, Apartment 20, Highland, Indiana." Appellant's Appendix Volume 2 at 144. He alleged that he had an expectation of privacy in the apartment because he lived there with Funches and that evidence was collected without a warrant or exigent circumstances. On July 20, 2015, and January 22, 2016, the court held a hearing on the motion to suppress. Heeringa testified that she had the authority to enter the apartment as an employee and that an addendum in the lease required residents to agree that "at any time for pretty much any reason we're allowed to go in their apartment" and "by any means that we see suitable." Transcript of Suppression Hearing Volume 2 at 12. Heeringa testified that she

never received any complaints of an unauthorized individual living with Funches. When asked if he recalled whether or not Funches's family said anything about Barker living with Funches, Detective Santino answered: "No. No one ever said anything about them." *Id.* at 57.

[19] After the State rested, Barker presented the testimony of several witnesses. Tashika Walker, Barker's sister, testified that Barker and Funches lived together in the apartment on Southmoor Avenue, Barker paid the rent, and that Funches "was just putting it in her name and taking it in." *Id.* at 139. She testified that certain items in the apartment belonged to Barker. On cross-examination, she testified that she visited Barker and Funches at that apartment but "[n]ot too often" and that she last saw Barker and Funches "a few days before the 21st" in Chicago. *Id.* at 145, 149. She also testified that Barker received mail at her father's house at 8350 South Green Street in Chicago.

[20] On June 1, 2016, the court entered an eight-page order concluding that Barker did not have standing to contest any possible unlawful search of the apartment and that, even if he did have standing, the search was reasonable under *Litchfield* and the Indiana Constitution, and denying Barker's motion to suppress. In part, the order states that Barker had not provided sufficient evidence to establish that he lived in the apartment and that "[i]n fact, if [Barker] claims to have lived in the apartment, that would be a violation of the lease agreement." Appellant's Appendix Volume 3 at 5. The court found that Barker "did not reside in Ms. Funches' apartment and therefore he does not

have standing to contest any unlawful search or seizure of Ms. Funches' apartment." *Id.* at 6.

[21] In October and November 2016, the court held a jury trial. Prior to trial, Barker's counsel renewed her request to suppress all evidence from Funches's apartment, and the court denied the motion. The State presented the testimony of numerous witnesses. Ruth, Funches's sister, testified on cross-examination that Barker resided in the same apartment with Funches. In part, the State presented evidence that a screwdriver was recovered from the apartment. *See* Trial Transcript Volume 3 at 235. The DNA profile obtained from the swab of the screwdriver matched Barker's DNA profile. Trial Transcript Volume 6 at 8. Dr. John D. Feczko testified that some of the wounds could have been caused by a screwdriver. Trial Transcript Volume 5 at 108. Sharon Pollock, the forensic DNA analyst, testified that Funches's DNA was not found on the screwdriver. Trial Transcript Volume 6 at 32.

[22] After the State rested, Walker, Barker's sister, testified that Barker stayed with "Angela" in the apartments in Highland and clarified that she was referring to Funches and indicated that Barker lived with Funches. *Id.* at 80. She testified that she had seen Barker and Funches together at that apartment previously and that Barker kept items there including personal belongings, clothes, furniture, jewelry, and a television. She testified that Barker had previously lived with his father, Frank Barker, at 8350 South Green Street, and that Barker and Funches were dating and expecting a baby together. She stated that Barker used construction materials for work on her father's house and that he used Quikrete

or concrete and in June 2011 was fixing the piping and a hole in the ground in the basement.

[23] On cross-examination, when asked why she called Funches Angela, Walker answered: "Just thinking of something else. I know who she is." *Id.* at 100. Walker indicated that Barker did not continue the work at her father's house and that he was not "around to fix it up" after Funches's death. *Id.* at 104. On redirect examination, Walker testified that she was not surprised that Barker moved in June of 2011 without notifying her because it was not unusual. Walker also testified that she did not have any communication with him from June 2011 until October 2013 when he was on the news.

[24] The jury found Barker guilty as charged. The court sentenced him to sixty-four years for murder and nineteen years for feticide as a class B felony and ordered the sentences to be served consecutively to each other for an aggregate sentence of eighty-three years.

## *Discussion*

[25] The issue is whether the trial court erred in admitting certain evidence. "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and reverse only if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (quoting *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013)). "[T]he ultimate determination of the constitutionality of a

search or seizure is a question of law that we consider de novo." *Id.* Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[26] In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter*, 18 N.E.3d at 1001. If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014).

[27] Barker argues that he had standing to object to the warrantless search of the apartment under both the Fourth Amendment and the Indiana Constitution. He points to evidence that he lived in the apartment with Funches, he paid rent and other bills, and a number of items such as clothing and furniture belonged to him. He asserts that, even if he did not live at the apartment full-time, he was a frequent guest and had a reasonable expectation of privacy. The State argues that Barker did not have a reasonable expectation of privacy in Funches's apartment and did not have standing to challenge the initial entry and brief search of the apartment.

[28] We note that Fourth Amendment rights are personal and may not be vicariously asserted. *Peterson v. State*, 674 N.E.2d 528, 532 (Ind. 1996) (citing *Rakas v. Illinois*, 439 U.S. 128, 133-134, 99 S. Ct. 421, 425 (1978)), *reh'g denied*,

*cert. denied*, 522 U.S. 1078, 118 S. Ct. 858 (1998).  "A defendant 'aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by the search of a third person's premises has not had any of his Fourth Amendment rights infringed.'"  *Id.* (quoting *Rakas*, 439 U.S. at 134, 99 S. Ct. at 425).  "[I]n order to challenge a search as unconstitutional, a defendant must have a legitimate expectation of privacy in that which is searched."  *Id.*  "To challenge a search 'a defendant must establish ownership, control, possession, or interest' in the premises searched."  *Campos v. State*, 885 N.E.2d 590, 598 (Ind. 2008) (quoting *Peterson*, 674 N.E.2d at 532-534).  The defendant must show a subjective and objective expectation of privacy in the premises.  *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577 (1979)).  *See also Peterson*, 674 N.E.2d at 532 ("The burden is on the defendant challenging the constitutional validity of a search to demonstrate that he had a legitimate expectation in the premises searched.") (citing *Livingston v. State*, 542 N.E.2d 192, 194 (Ind. 1989)).

[29]     One difference between the federal and state analyses is terminology.  *Allen v. State*, 893 N.E.2d 1092, 1096 (Ind. Ct. App. 2008), *reh'g denied*, *trans. denied*.  "In short, the U.S. Supreme Court has abandoned the concept of 'standing.'"  *Id.*  In *Rakas*, the United States Supreme Court determined that the "definition of those [personal] rights [that is, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties] is more properly placed within the purview of substantive Fourth

Amendment law than within that of standing." *Id.* (quoting *Rakas*, 439 U.S. at 140, 99 S. Ct. 421 (bracketed text inserted in *Allen*)).

[30]     In *Allen*, we observed that the principal difference between the Fourth Amendment and Article 1, Section 11 regarding the concept of standing was articulated by the Indiana Supreme Court in *Peterson*:

> We note that the federal inquiry into standing under the Fourth Amendment focuses, in most part, on the defendant's privacy expectation in the premises searched. While cases interpreting our state constitutional provision have also placed significant focus on the premises searched, *independent consideration is directed to the defendant's interest in the property seized*.

*Id.* at 1097 (quoting *Peterson*, 674 N.E.2d at 534 (emphasis added in *Allen*)). "The court recently acknowledged this difference: 'the Indiana Constitution provides protection for claimed possessions irrespective of the defendant's interest in the place where the possession was found.'" *Id.* (quoting *Campos*, 885 N.E.2d at 598; and citing *Sisk v. State*, 785 N.E.2d 271, 274 (Ind. Ct. App. 2003) ("While the inquiry into standing under the Indiana constitutional provision places a significant focus on the premises searched, like the applicable Fourth Amendment focus, independent consideration is directed to the defendant's interest in the property seized.")). "Notwithstanding this significant analytical difference, a review of our jurisprudence does not demonstrate much of a difference, if any, in result when a defendant's interest in seized property is not at issue." *Id.*

[31] Despite the differences between the federal and state constitutional analyses, the Indiana Supreme Court has noted that "'[m]any search and seizure issues are resolved in the same manner under both the Indiana and Federal Constitutions.'" *Id.* at 1098 (quoting *Campos*, 885 N.E.2d at 596).[3] With this background in mind, we turn to the instant case. Barker does not claim that he has an interest in any seized item. Rather, his challenge is based solely on his asserted interest in the apartment. Thus, as stated in *Campos*, state constitutional protection for claimed possessions is not at issue here. *See id.* at 1099. We see no reason why our resolution of this issue would be different under the Indiana Constitution than it would be under the United States Constitution. *See id.*

[32] Our focus then is whether Barker has established ownership, control, possession, or interest in the premises. *See Peterson*, 674 N.E.2d at 534. Barker must also show "a subjective and objective expectation of privacy in the premises." *See Campos*, 885 N.E.2d at 598 (citing *Smith*, 442 U.S. at 740, 99 S. Ct. 2577).

---

[3] In *Allen*, we noted:

> Even so, Indiana courts have continued to use the "standing" terminology when discussing Fourth Amendment claims. *See, e.g.*, *Campos*, 885 N.E.2d at 598; *Peterson*, 674 N.E.2d at 532; *Strangeway v. State*, 720 N.E.2d 724, 726 (Ind. Ct. App. 1999). On the other hand, at times we have acknowledged that the U.S. Supreme Court has dispensed with this terminology. *See Smith v. State*, 744 N.E.2d 437, 439 (Ind. 2001); *Edwards v. State*, 832 N.E.2d 1072, 1075 n.2 (Ind. Ct. App. 2005); *Best* [*v. State*], 821 N.E.2d [419, 424 n.2 (Ind. Ct. App. 2005)[, *reh'g denied*, *trans. denied*]; *Willis v. State*, 780 N.E.2d 423, 427 (Ind. Ct. App. 2002); *Mays v. State*, 719 N.E.2d 1263, 1266 (Ind. Ct. App. 1999), *trans. denied* (2000).

893 N.E.2d at 1097 n.4.

> This inquiry . . . normally embraces two discrete questions. The first is whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy—whether . . . the individual has shown that he seeks to preserve [something] as private. The second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable—whether . . . the individual's expectation, viewed objectively, is justifiable under the circumstances.

*Smith*, 442 U.S. at 740, 99 S. Ct. at 2580 (quotations and citations to *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967), omitted). "A person may maintain more than one home or place of habitation with the expectation that both will be free from an unlawful intrusion." *Mitchell v. State*, 259 Ind. 418, 423, 287 N.E.2d 860, 863 (1972). "As the United States Supreme Court has held, 'an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.'" *Fox v. State*, 983 N.E.2d 1165, 1168 (Ind. Ct. App. 2013) (quoting *Minnesota v. Carter*, 525 U.S. 83, 90, 119 S. Ct. 469 (1998)).

[33] The record contained evidence that Barker lived in Chicago. Funches listed him as her emergency contact on her application for residency and his address as 9350 South Green. Multiple documents which were introduced by the defense and admitted by the court found in Funches's apartment listed Barker's address as Chicago. The record reveals that Funches was the only individual listed as a resident on the lease which she signed on January 29, 2011.

[34] At the suppression hearing, Walker testified that Barker lived in Indiana with Funches "[f]rom the time she signed the lease" and stated "[m]eaning her moving in there." Transcript of Suppression Hearing Volume 2 at 152. At trial, when asked how long Funches and Barker had lived in the apartment, Walker answered: "It wasn't long. I believe they moved in March there." Trial Transcript Volume 6 at 81. At trial, on cross-examination, Ruth, Funches's sister, testified that it was fair to say that Funches lived with Barker, that he resided in the same apartment with Funches, and that Barker was not an overnight guest. Trial Transcript Volume 2 at 61. On cross-examination, Mattie Parker, a person who grew up with Funches, testified that Barker lived with Funches in June 2011. *Id.* at 83. The lease provided that "[v]isitors will be limited to 2 persons staying with Resident for a maximum of 14 days, whether consecutive or individually during each year of the Lease term." State's Suppression Hearing Exhibit 3. Given that Funches was the only individual listed on the lease and the lease limited visitors to stays of no more than fourteen days, we cannot say that Barker has demonstrated a reasonable objective expectation of privacy in the premises.

[35] We also note the condition of the apartment. The apartment was described as being in "complete disarray" by Heeringa. Transcript of Suppression Hearing Volume 2 at 10. Officer Norris observed that "everything was stacked up in the kitchen" and "everything was in disarray." *Id.* at 165. The bedroom did not have any mattresses or carpet, what appeared to be stains were present on the floor, and the closet mirror was cracked. During his walkthrough of the living

room, kitchen, and hallway, Detective Santino did not see a cot, a sleeping bag, or anything to indicate that someone was staying there that day. In the bedroom, Detective Santino observed that there was not even a mattress or box spring and it did not appear to him that anyone was staying in the bedroom. Detective Santino indicated that the apartment appeared abandoned "[f]or all practical purposes." *Id.* at 85.

[36] We conclude that Barker has not demonstrated that he could contest the search of Funches's apartment. *See Peterson*, 674 N.E.2d at 533 (observing in part that the apartment was leased to the defendant's mother and sister, the mother paid the rent, and mother had the sole determination as to whether or not he could reside at the apartment, and concluding that the defendant lacked standing to challenge the search); *Allen*, 893 N.E.2d at 1099-1100 (holding that a defendant must show a legitimate right to the premises searched, that the defendant was a trespasser, and that he made no showing that he had a legitimate right to control and possess the residence, and concluding that the defendant lacked standing to challenge the searches of the residence).

[37] Even assuming that Barker could challenge the initial searches of the apartment, we cannot say that reversal is warranted under either the Fourth Amendment or the Indiana Constitution. We first consider the Fourth Amendment.

A. *Fourth Amendment*

[38] Barker argues an exigency in determining whether Funches was in the apartment and in need of assistance did not exist at the time that the police entered the apartment without a warrant. He cites *Mincey v. Arizona*, 437 U.S. 385, 394 (1978), in which the United States Supreme Court held that there was no "murder scene exception" to the Fourth Amendment's search warrant requirement. He asserts the admission of all of the evidence from the apartment and any derivative evidence was not harmless error.

[39] Barker does not cite to the record or point to specific testimony or exhibits that were retrieved by the Highland Police after receiving information from the Chicago Police that Funches's body had been tentatively identified. Without citation to the record, Barker asserts that the "erroneously admitted evidence includes all of the descriptions and photographs of the scene" and "the blood and DNA evidence from the scene." Appellant's Brief at 19. He argues that any evidence derivatively gained as a result of the information or leads obtained during the unlawful search should be barred from admission at trial under the fruit of the poisonous tree doctrine.

[40] The State argues that the search was reasonable and justified by exigent circumstances and valid consent. The State also argues that, even if the trial court erred by admitting the photographs, the error was harmless.

[41] The Fourth Amendment to the United States Constitution provides, in pertinent part: "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated . . . ." U.S. CONST. amend. IV. If the search is conducted without a warrant, the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016).

[42] One well recognized exception to the warrant requirement is for an entry under emergency circumstances. *Vitek v. State*, 750 N.E.2d 346, 348-349 (Ind. 2001), *reh'g denied*. "It is not necessary for police to have a warrant to enter a residence when the circumstances suggest a reasonable belief that a person within the premises is in need of aid." *Id.* at 349 (citing *Stewart v. State*, 688 N.E.2d 1254, 1257 (Ind. 1997)). The Indiana Supreme Court has "recognized that there can be a reasonable belief that a person may be in need of aid within a premises when the occupant has been missing." *Id.* "Most cases upholding this exception have found that a person's absence, combined with other circumstances, have created the exigent circumstances necessary for a warrantless search." *Id.* "Other courts have also recognized that warrantless searches may be appropriate to seek an occupant reliably reported missing." *Id.* (citing 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 6.6(a) (1996) at 396; *United States v. Presler*, 610 F.2d 1206 (4th Cir. 1979) (upholding a warrantless search where the defendant's landlady had not seen him for some time and an unusual odor was emanating from his room); *State v. Blades*, 225 Conn. 609, 626 A.2d 273 (1993) (upholding warrantless search where victim's relatives worried about her whereabouts and she had been involved in a troubled marriage and her mother believed her husband had harmed her)).

[43]   The record reveals that Officer Norris received a dispatch regarding a welfare check, one of the leasing agents told him that there were blood stains on some rolled-up carpet inside of the apartment, and the leasing agents mentioned to him that they had "peeked in and seen some things which then led them to believe that they should back out and call the police." Transcript of Suppression Hearing Volume 2 at 162. We conclude that the initial entry into the apartment by police was not improper. *See Vitek*, 750 N.E.2d at 349 (holding that the circumstances of the case supported the officer's search of the defendant's home). *See also* JOHN WESLEY HALL, JR., SEARCH AND SEIZURE 1238 (4th ed. 2012) ("Entries are justified to look for missing persons.") (citing *People v. Wharton*, 809 P.2d 290 (Cal. 1991), *cert. denied*, 502 U.S. 1038, 112 S. Ct. 887 (1992); *Chaney v. State*, 612 P.2d 269 (Okla. Crim. App. 1980), *cert. denied*, 450 U.S. 1025, 101 S. Ct. 1731 (1981)).

[44]   "Although the warrant requirement is relaxed somewhat where, as in this case, there is a legitimate missing persons claim, there is no unlimited 'missing persons' exception." *Vitek*, 750 N.E.2d at 349. "Even in a missing persons case, there must be exigent circumstances to justify a warrantless search." *Id.* *See also* WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.6(a) (5th ed. October 2017 Update) ("As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case basis, taking into account the type of emergency which appeared to be present. . . . The officer's post-entry conduct must be carefully limited to achieving the objective which

justified the entry—the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.").

[45] The record reveals that the officers were not informed that the Chicago Police had tentatively identified the body as that belonging to Funches until ninety minutes to two hours after Detective Santino arrived at the apartment. We cannot say that some further investigation prior to being informed that a body was discovered was improper. *See Wharton*, 809 P.2d at 325 ("Because there existed the possibility that the victim was still alive, we cannot fault the officers' decision to investigate further.").[4]

[46] With respect to consent, "[c]onsent to search is valid when it is given voluntarily, voluntariness is a question of fact determined from the totality of the circumstances." *Garcia-Torres v. State*, 949 N.E.2d 1229, 1237 (Ind. 2011). We observe that Heeringa testified that she had the authority to enter the apartment as an employee and that an addendum in the lease requires residents to agree that "at any time for pretty much any reason we're allowed to go in their apartment" and "by any means that we see suitable." Transcript of

---

[4] In his statement of facts, Barker asserts that the CSI unit was processing the scene when Detective Santino received the notice from the Chicago Police regarding the discovery of the body. He points to a portion of the transcript of the suppression hearing at which Detective Santino indicated that the crime lab "was there and they were still processing it" when he received information about the body from the Chicago Police. Transcript of Suppression Hearing Volume 2 at 91. However, Barker later asserts, without citation to the record, in his argument section that Detective Santino "called in the CSI unit and had it process the apartment. This was all prior to getting a warrant and *prior to receiving notification from the Chicago Police that [Funches's] body had been found*." Appellant's Brief at 16 (emphasis added).

Suppression Hearing Volume 2 at 12. An addendum to the lease was signed by Funches and provides in part: "ACCESS. Resident shall allow Owner and his agents free access to the apartment at all reasonable times to exhibit, repair or inspect the same or for any other reasonable business purpose connected with the operation of the building." State's Suppression Hearing Exhibit 3. Heeringa also testified that taking time to check on the welfare of the tenants was a good business practice. Newton, the leasing consultant, testified that a welfare check was something they did upon request and that they did it a few times a year. Further, Officer Norris spoke with the apartment employees, and they gave him information as to the apartment that he needed to check. The leasing agents informed Officer Norris that "a female had not been seen or heard from in a while, so they were going to let [them] into the apartment, if we could have a welfare check on her." Transcript of Suppression Hearing Volume 2 at 162. When asked if she "let [the police] back into the apartment," Heeringa answered: "I did." *Id.* at 11. Under these circumstances, we conclude that the officers had consent to enter Funches's apartment.

[47]     Even assuming the collection of evidence following the initial walkthrough was improper, admissions of evidence in violation of the Fourth Amendment are subject to harmless error analysis. *Smock v. State*, 766 N.E.2d 401, 407 (Ind. Ct. App. 2002) (citing *Jackson v. State*, 669 N.E.2d 744, 750 (Ind. Ct. App. 1996)). Harmless error occurs when the conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no likelihood that the erroneously admitted evidence contributed to the conviction.

*Morales v. State*, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001). Violations of the Fourth Amendment must be harmless beyond a reasonable doubt. *Id.* We must find that there is no substantial likelihood the error contributed to the verdict, or, in other words, that the error was unimportant in relation to everything else before the jury on the issue in question. *Id.*

[48] Newton, a leasing consultant, testified without objection that she entered Funches's apartment to check on her welfare and observed that the carpet was missing from the dining room and the hallway area, it had been ripped out, and there was rolled-up carpet in the living room. She testified that there was furniture located in various areas of the apartment where it should not have been, such as a dresser in the kitchen, and the apartment looked like it had been ransacked.

[49] Pettigrew testified that she lived at the apartment complex and observed two men coming down the stairs with a bin on June 21, 2011, around 11:00 p.m. and recognized one of the men as Barker. She testified that she made eye contact with Barker, he "ducked his head real quick," and "it troubled [her] spirit." Trial Transcript Volume 3 at 186, 202. She stated that the men struggled with the bin and headed towards a green Caravan that Barker recognized as the same Caravan that Barker had driven previously. She also observed that the Caravan had two mattresses on top. She testified that she did not identify anyone in the photo lineups she was shown by the police "right then and there," but she identified Barker as Funches's boyfriend whom she saw that night. *Id.* at 192. On cross-examination, when asked if it "[d]idn't

look like" Barker on the photo lineup, she answered: "I wasn't quite sure. Maybe I should say that. But I know it's him now." *Id.* at 196.

[50] During cross-examination, Detective Santino indicated that Barker's Illinois driver's license, a traffic warning issued to Barker, a receipt for motor vehicle immobilization and/or impound vehicle with Barker's name on it, and Barker's application for a truck driving school, were found in the apartment. Defense counsel introduced and the court admitted these documents, all of which indicated Barker's address as being in Chicago.

[51] FBI Special Agent Peasley testified that he investigated identifying markers on the bin in which Funches's body was found. He was able to locate the manufacturer of the tote in which Funches's body was found and determined that totes with that UPC code were sold only at Walmart. Surveillance video and photos taken from the video on the evening of June 21, 2011, from the Walmart in Schererville were admitted. Highland Police Investigator Shaginaw testified that Barker and Barlow were seen in the Walmart video.

[52] Highland Police Investigator Douglas Shaginaw testified that he investigated where the items found in the green Taurus were purchased. He retrieved a video from a True Value located in Chicago, determined that a vehicle arrived on the morning of June 22, 2011, recognized a person on the surveillance video as Barker, and learned that the person to Barker's left in the video was Barlow. Investigator Shaginaw took photographs of certain pieces of merchandise inside the store, including Quickrete, blue and white handled scrub brushes, Liquid

Fire, and a plastic bucket, which were all similar to the evidence that was collected from the Taurus. He also photographed a Fortress brand lock at the store. The court admitted a sales receipt from True Value, and Investigator Shaginaw testified that the prices on the receipt correlated to the prices of the items found in the Taurus as well as a price of $6.49 which correlated to the Fortress brand lock. He testified that the lock in the True Value was identical to the lock that was used to secure the garage which contained Funches's body.

[53] Sharon Pollock, a forensic DNA analyst employed by the Indiana State Police Laboratory, testified that the partial Y-STR DNA profile obtained from Funches's fingernail clipping was consistent with the Y-STR DNA profile obtained from Barker.[5]

[54] In light of the evidence, particularly the evidence placing Barker at the apartment complex on the day of the murder, of him moving a bin out of the apartment that night, and of the purchases including a bin and a Fortress brand lock that were the same bin and lock later discovered at the scene where Funches's body was found, we conclude that any error in the admission of evidence obtained from the apartment was harmless. We cannot say that Barker's rights under the Fourth Amendment were violated.

---

[5] Specifically, Pollock testified that the partial Y-STR DNA profile obtained from the clipping was "consistent with the Y-STR DNA profile obtained from Isiah Barker and is not consistent with the Y-STR DNA profile obtained from Octavius Barlow. Therefore, Isiah Barker and all of his male paternal relatives cannot be excluded as potential Y-STR DNA contributors to the sample." Trial Transcript Volume 6 at 43.

B. *Article 1, Section 11*

Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Although its text mirrors the federal Fourth Amendment, we interpret Article 1, Section 11 of our Indiana Constitution separately and independently. *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). "When a defendant raises a Section 11 claim, the State must show the police conduct 'was reasonable under the totality of the circumstances.'" *Id.* (quoting *State v. Washington*, 898 N.E.2d 1200, 1205-1206 (Ind. 2008), *reh'g denied*). "The focus of the exclusionary rule under the Indiana Constitution is the reasonableness of police conduct." *Hardister v. State*, 849 N.E.2d 563, 573 (Ind. 2006). "We consider three factors when evaluating reasonableness: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Robinson*, 5 N.E.3d at 368 (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

Barker argues that the degree of concern, suspicion, or knowledge that the police had was not terribly strong and that the fact that Funches was not in the apartment rendered the need to enter the apartment not strong. He contends

there was no indication that something illegal was occurring at that time in the apartment and that the degree of intrusion was significant because law enforcement repeatedly entered the apartment. He further asserts that law enforcement's needs were minimal. The State maintains that the degree of suspicion was significant, the degree of intrusion was reasonable, and the extent of law enforcement needs indicated that the entry into the apartment was reasonable.

[58] With respect to the degree of concern, suspicion, or knowledge that a violation had occurred, Officer Norris received a dispatch regarding a welfare check and spoke with the apartment employees who told him that they saw things which led them to believe they should back out and call the police. One of the leasing agents also told Officer Norris that there were blood stains on some rolled-up carpet inside the apartment. As for the degree of intrusion, we acknowledge that the warrantless entry of a home is generally considered a large intrusion. *See Trotter v. State*, 933 N.E.2d 572, 581 (Ind. Ct. App. 2010) ("It is well established that '[h]ouses and premises of citizens receive the highest protection' under our constitution.") (quoting *Moran v. State*, 644 N.E.2d 536, 540 (Ind. 1994), *reh'g denied*, *abrogated on other grounds by Litchfield*, 824 N.E.2d 356). In this case, however, the officers did not break down the door and barge into the home. On the contrary, the police were contacted by a leasing agent at the apartment complex regarding a welfare check and the leasing agent opened the door. The officers walked through the apartment, Funches was listed on the lease as the only resident, and Detective Santino did not see a cot, a sleeping

bag, a mattress, or anything to indicate that someone was staying in the apartment. We also observe that Detective Santino stated that the apartment appeared abandoned "[f]or all practical purposes." Transcript of Suppression Hearing Volume 2 at 85. Under the circumstances, the degree of intrusion was not high.

[59] With respect to the third factor listed above, we observe that police officers have a caretaking function as well as an investigatory function. *See Montgomery v. State*, 904 N.E.2d 374, 382 (Ind. Ct. App. 2009), *trans. denied*. "It is because of concerns among citizens about safety, security, and protection that some intrusions upon privacy are tolerated, so long as they are reasonably aimed toward those concerns." *Holder v. State*, 847 N.E.2d 930, 940 (Ind. 2006). The extent of law enforcement needs was strong given the circumstances leading to the search including the welfare check for Funches. Under the totality of the circumstances, we conclude that the search was reasonable and did not violate Barker's rights under Article 1, Section 11 of the Indiana Constitution.

## *Conclusion*

[60] We conclude that reversal is not warranted under the Fourth Amendment of the United States Constitution or Article 1, Section 11 of the Indiana Constitution.

[61] For the foregoing reasons, we affirm Barker's convictions.

[62] Affirmed.

Najam, J., and Kirsch, J., concur.